ARTHUR CAPPER, *Appellee*, v. THE MANUFACTURERS
PAPER COMPANY, *Appellant*.

No. 16,854.

SYLLABUS BY THE COURT.

1. CONTRACTS—*Sales—Breach—Cancellation—Waiver.*—Under a contract to furnish for the publication of a newspaper 720 tons of paper during one year with a leeway of 5 per cent over or under in quantity per year, the shipments to be at the rate of 60 tons a month, more than the last amount was shipped for several months, but the purchaser, though calling attention to the matter, accepted the paper. *Held,* that such acceptance amounted to a waiver of the right to complain afterwards of such overshipments.

2. SALES—*Wrongful Cancellation by Seller—Measure of Damages.* In such case, on cancellation of the contract and refusal to ship, if there be no market at the place of delivery the buyer may purchase in the nearest market and the measure of his damages is the difference between the price there and the contract price.

3. CONTRACTS—*Cancellation—Waiver — Question of Fact.* The court instructed that if the purchaser failed to make payments as provided in the contract, the seller had a right to cancel unless such failure had been waived, and that if the jury should find from the evidence that anything said or done under the contract induced plaintiff (the purchaser) to believe that this condition had been waived or that strict compliance would not be insisted upon, the defendant would be estopped from afterwards claiming for nonperformance. *Held,* not subject to the complaint that the court was thereby leaving it to the jury to determine a question of law.

4. SPECIAL QUESTIONS—*Judicial Discretion.* It is within the discretion of the trial court to refuse or withdraw special questions calling for evidential reasons for particular findings.

5. PLEADINGS—*Objection to Evidence—Demurrer—Answer.* In an action for breach of a contract containing reciprocal obligations, the failure to allege performance on plaintiff's part should be called to the court's attention by demurrer rather than by objection to evidence; and when nonperformance by the plaintiff is alleged in the answer and proof of performance follows, *held,* that the lack of such allegation in the petition becomes immaterial.

6. SALES—*Payments—Acceptance—Strict Performance Waived.*

The contract required payments to be made within 30 days from date of invoice, 3 per cent discount to be allowed on remittance within that time. A continued course of dealing and certain correspondence showed repeated acceptance of delayed payments and an intention to continue the shipments, the buyer being advised that in the future the 3 per cent discount could not be allowed on payments made after the 30 days. *Held*, that proof of these facts is sufficient to sustain a finding that past failures to remit promptly were thereby waived, and the defendant could not legally cancel the contract on account of such failures.

Appeal from Shawnee district court. Opinion filed February 10, 1912. Affirmed.

*Bennett R. Wheeler*, and *John F. Switzer*, for the appellant.

*Eugene S. Quinton*, for the appellee.

The opinion of the court was delivered by

WEST, J.: On August 30, 1906, plaintiff, Arthur Capper, and the defendant paper company entered into a written contract by which the latter agreed to furnish, for use in the publication of the Topeka *Capital* during one year from October 1, 1906, to October 1, 1907, 720 tons of paper with a leeway of 5 per cent over or under in quantity per year, the shipments to be at the rate of 60 tons per month. The plaintiff agreed to pay $2.12 a hundred pounds, f. o. b. Topeka, payment to be net cash 30 days from date of invoice in Chicago and New York exchange, a discount of 3 per cent to be allowed for payment within the thirty days. It was provided that in case of failure to pay any amounts due under the contract or to make settlement as provided the paper company might at its option cancel the contract. Shipments began October 1, 1906, and for some time more than 60 tons per month were sent by the paper company and its attention was called by the plaintiff to the fact of overshipment, but all the amounts sent were accepted. Re-

mittances were made from time to time in which the 3 per cent discount was claimed, but the 30-day period having been passed the company in receipting would call attention to this fact and assert a charge for the 3 per cent. In February, 1907, only about 33 tons were shipped, and in March only about 40 tons. On March 1, 1907, a request was made for shipment of an extra car and for one car thereafter every 10 days. On March 4 word was received that the paper company was hampered in securing cars but that it would do all it could to forward a car as per instructions. On March 9 a statement was made by the company that a car would be forwarded as soon as possible and suggesting that a few rolls of paper be borrowed to tide over for a day or two. On March 12 the company wrote that it did not know how soon the car could be shipped but that all possible would be done to hurry the same. On March 14 the company wrote that a car had been forwarded. On March 13 the plaintiff wrote the company requesting two extra cars to be shipped at once, suggesting that it was his aim to keep in storage about two cars for such emergencies as he was then passing through, and requesting shipments regularly every ten days thereafter until further advice, also inclosing a draft for former invoices, claiming a discount of 3 per cent. On March 15 the remittance was acknowledged with a notification that the 3 per cent could not be allowed but was charged back to the plaintiff's account. On March 20 the plaintiff requested 4 cars a month instead of 3, and on the same day the company wrote that a car could not be shipped until the coming Saturday, that conditions were such that it would be absolutely impossible to get the car out before that date. On March 21 the company wrote that it was instructing its mill to increase the order to 4 cars each month, the letter closing: "We trust that within a short time conditions will again become normal, and that everything will be lovely." On March 23

a remittance was receipted for and the plaintiff was advised that the 3 per cent could not be allowed as the remittance was too late to entitle him thereto. On March 28 plaintiff wrote the company complaining of the shortage in shipments and of its refusal to allow the discount, and suggesting that it would be in better grace to overlook the fact that remittances had not been quite on the schedule time until shipments could be made on schedule time. On April 2 the company wrote that owing to inability on the part of the mill to secure raw material it had been shut down and that the defendant would be unable to ship a car much before the 15th, "when we will resume regular shipments." The letter contained the following:

"I note all you state in regard to the discount which I advised you we could not allow, and while I appreciate what you say, I must now advise you that we can not allow in future these discounts unless invoice is settled for within the terms of the contract, and trust you will meet our views in this matter. Trusting if in need you will be able to secure a little paper for your wants until we can resume shipments, I remain,"

On April 4 remittance was receipted for, the letter containing these words: "We have not taken into account any allowance for discount, as all of the invoices were past due." On April 9 plaintiff wrote to know when the next car could be shipped, and on April 14 requested the same information by telegram, and on April 18 repeated the request. On April 19 the company wrote a letter containing the following:

"Owing to your repeated breaking of the contract under terms of settlement, we are forced to advise you of cancellation of our contract, and no more paper will be shipped under same. We have been very patient in regard to your settlements, and whereas the terms are 3 per cent for cash 30 days from date of invoice, you have been settling on an average of 60 to 70 days against our protest, and we feel justified in our action."

Up to the date of this letter the company had shipped 411 tons of paper.

This action was begun to recover damages for breach of contract, the answer alleging the failure of the plaintiff to remit within 30 days and nonpayment of the 3 per cent, thereby justifying the cancellation of the contract; the reply alleging that the 30-day provision had been waived by the company, and that it canceled the contract for the reason that the price of paper had gone up, and that having accepted payments made after the contract time the company was estopped to claim the right to cancel the contract.

When the dealings closed and when the suit was begun plaintiff owed about $1500 and the action was to recover the amount of damages claimed less this sum; but upon the trial, having been sued for the balance in the meantime, plaintiff amended his petition so as to include this amount. In a letter of June 25, 1908, the second vice president wrote:

"I fully appreciate how you feel in regard to our action of cancellation of contract, and don't know that I blame you. I can only advise as far as our company is concerned, I was forced to this action by our mill, and legally, as we had not a leg to stand on; had I not followed their instructions as their agent, my company could have been forced to have gone into the open market and purchased the paper to carry out your contract."

The jury found in favor of the plaintiff, and the defendant appeals and urges that its objection to evidence under the petition and its demurrer to the evidence should have been sustained, that the trial court erred in reference to certain instructions and special questions, and in denying judgment on the findings and a new trial.

It is suggested that as an aggregate of more than sixty tons a month up to April 1 had been shipped and received, such reception amounted to a waiver of the right to complain on account of overshipment, and this

is correct. It is said that the overshipments should have been carried forward and applied on succeeding months, but as they were voluntary on the part of the defendant, the plaintiff, who had called attention thereto, was not compelled to carry them over. The cited case of *Pierce v. Smith,* 25 N. H. 208, involved a contract to deliver certain articles in September. The seller shipped a part the previous May, which were accepted, and this was held to be equivalent to a September shipment of all, the articles in question being delivered by way of payment for certain land. (See, also, *Norrington v. Wright,* 115 U. S. 188, 204.) Complaint is made that the court did not restrict the measure of damages to the market price of paper at Topeka, and it is said that the rule requires the difference between the contract price and the market value of the goods to be determined by the price at the time and place appointed for delivery. This is the general rule, but it has exceptions. When goods are purchased for a particular purpose, and there is no market at the place of delivery, the vendee may go to the nearest market for them. (*Lumber Co. v. Sutton,* 46 Kan. 192, 26 Pac. 444; *Evans v. Moseley,* 84 Kan. 322, 114 Pac. 374; *Arn v. Matthews,* 39 Kan. 272, 18 Pac. 65.)

"The basis of such rule is that the buyer at the time of the breach presumably could have supplied himself with the goods at the time and place agreed upon for the delivery; and where such is not the case the rule does not apply." (*Vogt v. Schienebeck,* 122 Wis. 491, syl. ¶ 7, 100 N. W. 820, 67 L. R. A. 756.)

The plaintiff was permitted to testify without objection that he went on the market and purchased paper, and that he got thirty-four tons of it at Kansas City. No attention seems to have been paid to the question of the market price at Topeka during the trial, either in the testimony or in the instructions offered or given. However, the court, at the defendant's request, submitted question No. 23, asking the price at Topeka,

and the jury answered that it was $2.69, which seems fairly conclusive of the matter.

The court instructed that the contract required substantially sixty tons a month to be shipped. This was correct. The refusal to instruct that the acceptance of more a month amounted to a waiver was not prejudicial to the defendant, as the plaintiff was not seeking to cancel the contract, but was suing because the defendant had canceled it.

The court instructed that if the plaintiff failed to make payments as provided in the contract and this provision had not been waived, the company had a right to cancel; but if the jury should find from the evidence that anything said or done under the contract induced plaintiff to believe that this condition was waived, the defendant would be estopped from afterwards claiming nonperformance. This is complained of as leaving it to the jury to determine whether or not there was a waiver, which is said to be a question of law. The instruction hardly bears this interpretation. It was the same as telling the jury that if they found that the defendant had said or done anything which induced plaintiff to believe that it intended to continue shipments notwithstanding his delayed remittances, the defendant could not thereafter refuse shipments on account of such delay. What the jury might conclude was thus said or done would be more nearly a finding of fact than a conclusion of law, and we think the instruction was not materially prejudicial.

"Whether it (waiver) exists or not in the particular case upon trial is for the jury to decide, upon instructions by the court." (*Minor v. Edwards & Price,* 12 Mo. 137, 139, 49 Am. Dec. 121.)

Whether there had been a waiver of proofs of loss, the evidence being conflicting, is a question for the jury.

"Whether there has been a waiver of the conditions of a contract is, where the question depends upon declarations or conduct, *a question of fact* for a jury." (1 Thomp. Trials, § 1436.)

In answer to question No. 19, whether defendant did anything to constitute a waiver of default, the jury answered "Yes." Question No. 21 was somewhat similar. Questions 20 and 22 requested the jury to state in full what the defendant did to constitute such waiver, and the latter was answered: "By accepting payment in full, with three per cent discount deducted, without protest, prior to March 15, 1907, and continued shipment"; but this question and answer were withdrawn by the court. The questions might very properly have been submitted and answered, but as they called for a statement in full of what the defendant did to constitute a waiver, they were subject to the objection of calling for too much of the evidence, and the court did not abuse its discretion in the rulings made.

"Generally the court may, in its discretion, refuse to require the jury to state new facts showing why it finds in a particular way upon some very general question of fact stated by one of the parties." (*Foster v. Turner,* 31 Kan. 58, syl. ¶ 1, 1 Pac. 145.)

(See, also, *Matheney v. El Dorado,* 82 Kan. 720, 109 Pac. 166.)

Counsel insist that plaintiff neither alleged nor proved full compliance with the contract on his part. An objection to evidence on this ground was properly overruled. (*Howard v. Carter,* 71 Kan. 85, 80 Pac. 61; *Railway Co. v. Murphy,* 75 Kan. 707, 90 Pac. 290.) Compliance on his part up to the time the defendant canceled the contract was proved, unless the delay in remitting was not shown to have been waived, but the jury in effect found that it had been waived. Proof of performance or of an offer to perform is generally held to be sufficient, and if the petition was deficient in allegation the question should have been raised by demurrer rather than by objection to testimony. Instead of demurring to the petition the defendant answered, setting up the alleged nonperformance on the part of

the plaintiff, which amounted to an election to raise the question by answer rather than by demurrer; at any rate, the proof was supplied, and this cured the error, if any had been committed. (*Grandstaff v. Brown*, 23 Kan. 176; *Smith v. Smith*, 75 Kan. 847, 89 Pac. 896.)

(For a discussion and decision of a question quite analogous, see *Benefit Association v. Wood*, 78 Kan. 812, 98 Pac. 219.)

The main question is the alleged justification of the cancellation. It is true that if plaintiff were in default as to his obligations under the contract, this would justify cancellation unless such default had been waived. (*Lumber Co. v. Lumber Co.* ante, p. 131, 119 Pac. 321; *Lumber Co. v. Lumber Co.*, ante, p. 264, 120 Pac. 367.) However, the jury and the trial court concluded that the default had been waived, and the correspondence fully justifies such conclusion. Had there been no difficulty in getting supplies from the mill and in securing cars, the letters of the defendant in April show that the shipments would have continued. From the later letter, already quoted, it is plain that the paper company, instead of going into the market for paper, the price of which had risen, in order to carry out the terms of its contract, preferred to cancel, using as an excuse the very delay it had, by a continued course of conduct and by the letter of April 2, overlooked and waived. True, the letter of April 4 expresses an intention not to allow the discount, but it bears on its face no indication to retract from the position taken by the letter two days earlier, in which it was said: "We must do the best we can towards helping each other," and "trusting if in need you will be able to secure a little paper for your wants until we can resume shipments, I remain—"

The result reached by the trial court was in harmony with the facts and with the law, and the judgment is affirmed.