DOW CHEMICAL CO. *v.* DETROIT CHEMICAL WORKS.

1. SALES—DELIVERY TO CARRIER—PASSING OF TITLE.
   In the sale of goods the general rule that title passes when the vendor has fully performed in the appropriation and delivery of the goods to the vendee, and delivery to a public carrier for transportation constitutes delivery to the vendee, has been adhered to in this State, and is, in effect, incorporated in the uniform sales act (3 Comp. Laws 1915, §§ 11849, 11850, 11873, 11877).

2. SAME—RIGHT TO REJECT AFTER ACCEPTANCE.
   Title may pass even though the right to reject after acceptance be reserved.

3. SAME—PLACE OF DELIVERY.
   A provision in a contract for the sale of 900 tons of sulphuric acid to be delivered in monthly installments providing that the price should be "$12 per ton f. o. b. vendor's tank cars, Detroit, Mich., less freight to Midland, Mich.," construed, and *held,* that place of delivery was at Detroit, although the buyer had the right to deduct the freight to Midland.

4. SAME—DELIVERY—TIME OF PAYMENT.
   In view of section 42 of the uniform sales act (3 Comp. Laws 1915, § 11873) fixing the time of payment concurrent with delivery unless otherwise provided, where the contract provided payment to be "net cash in ten days," payment was due ten days from delivery of each installment at Detroit.

5. SAME—CANCELLATION OF CONTRACT—DEFAULT.
   Where the contract gave the vendor the option, in case the buyer failed to make payment according to its terms, to delay further shipment until payment was made or cancel the contract, the vendor had the right, when the buyer failed to make payment within ten days of delivery at Detroit, to cancel the contract.

6. WAIVER—NOTICE—INTENT.
   Waiver implies the abandonment of a right by a person entitled to exercise it, who has at the time full knowledge

of the existence of the fact on which the right depends, and such knowledge and the intention to relinquish the right must concur.

7. SAME—DEFAULT—NOTICE.

Although, under the contract, payment for an installment became due on February 1st and vendor made another shipment on February 3d, without having received payment for previous shipment, said action cannot be said to be a waiver of its right to rescind, since payment might have been in the mails, and vendor, at the time of the alleged waiver, had no definite knowledge of the default.

8. SALES—SHIPMENT IN INSTALLMENTS—DEFAULT.

Although the contract provided for approximately equal monthly shipments, where first shipment was made on January 22d in response to buyer's notification on January 20th, and second shipment for that month was made on February 3d, *held*, that the vendor was not in default in not making shipment of second installment in January.

Error to Wayne; Webster (Clyde I.), J. Submitted June 10, 1919. (Docket No. 100.) Decided December 22, 1919. Rehearing denied June 17, 1920.

Assumpsit by the Dow Chemical Company against the Detroit Chemical Works for breach of a contract of sale. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*Beaumont, Smith & Harris* and *G. A. Currie*, for appellant.

*Monaghan, Monaghan, O'Brien & Crowley*, for appellee.

FELLOWS, J. On June 8, 1915, the parties hereto entered into the written contract following:

"The Detroit Chemical Works of Detroit, Michigan, vendor, agrees to sell and deliver to the Dow Chemical Company of Midland, Michigan, purchaser, and the said purchaser agrees to buy, receive and pay for the

merchandise hereinbelow described, in the quantities and at the prices herein named, during the period of one year from January 1st, 1916, and according to the terms and conditions named below:
"Description and Quantity:
"Nine hundred (900) net tons (2000 lbs.) of sulphuric acid commercial grade of approximately 60° Be. Strength.
"Prices:
"Twelve dollars ($12.00) per ton, f. o. b. vendor's tank cars, Detroit, Michigan, less freight to Midland, Michigan, all deliveries to be computed to and billed as 60° Be.
"Deliveries:
"To be made and taken in approximately equal quantities throughout the months of 1916—as nearly as may be 75 tons per month.
"Terms of Payment:
"Net cash in 10 days.
"Conditions:
"Each shipment to be treated for the purpose of settlement, as a separate and independent sale, but if buyer fails to make payment for any materials furnished by vendor according to terms of sale, said vendor may defer additional shipments until payment is made, or may cancel this contract at his option.
"Payment of all bills to be made in United States gold coin or its equivalent in United States currency. The vendor reserves the right to decline to make deliveries on this contract except for cash, whenever said vendor shall have any doubt as to buyer's responsibility and so informs buyer. Deliveries to be renewed according to contract terms when buyer shall have satisfied said vendor as to his responsibility.
"It is understood and agreed that any decline or advance in freight rates or other transportation charges which may be made subsequent to date of this contract shall be for the account of and borne by the buyers.
"Vendor shall not be held responsible for failure of delivery when same is due to strikes, fire, casualties at their works, delays in transit, or other contingencies beyond their control.
"This contract agreed to as above."

The acid under this contract was to be delivered during the year 1916. On January 20, 1916, plaintiff wrote defendant referring thereto:

"There is due on our contract 75 tons of 60° acid this month. This is approximately two cars. Please make shipments about three or four days apart."

On January 22d, defendant replied thereto:

"We are shipping you one car today, in compliance with your request, and a second car will follow the latter part of next week, which we trust will be satisfactory."

The first car was shipped and invoiced as of that day. It contained 62,500 pounds of acid testing 59.58, being the equivalent of 61,930 pounds of 60° acid. It was billed at the contract price of $12 per ton, less the freight to Midland of .104 per cwt., making a net of $306.58. The invoice reached plaintiff on January 27th. The car did not arrive in Midland until the 29th (Saturday), about 4 p. m. It was delivered at plaintiff's plant on the 31st. On February 3d, plaintiff wrote defendant:

"Please rush shipment of the balance of sulphuric acid due on our contract for shipment during January. Also get the February quota out for us. These cars may be distributed approximately in even shipments over this month."

On that day, and before receiving plaintiff's letter, defendant had shipped the second car. It was billed out as of February 3d, and contained 61,960 pounds of 60° acid. The invoice price, after deducting freight, was $307.32. This car reached Midland on February 8th. It was not received by plaintiff until the 19th. This was considered by both parties as in fulfillment of the January quota.

On February 7th, defendant's treasurer dictated a letter to plaintiff, which was, however, not mailed until the 9th. It reads as follows:

"Owing to the fact that you seem determined to ignore the terms of our contract with you for 60° sulphuric acid, we now elect, under the terms of said contract, to declare same canceled.

"Our invoice to you of January 22d, for delivery of the first car of sulphuric acid, under this contract, matured on the 1st. Up to this writing we have not received remittance for same.

"On December 8th last, we wrote you at some length on this very subject, calling your attention to the fact that you were endangering your contract by your nonobservance of the terms thereof.

"We will, therefore, now cancel this contract.

"Trusting you will see the justice of our position, we remain."

This reached plaintiff on the 10th, and on the same day plaintiff's agent went to Detroit and paid defendant for the first car shipped. On February 12th, plaintiff paid defendant for the second car shipped. The defendant refused to make further shipments as requested by plaintiff, claiming that it had canceled the contract by its letter of February 7th, and that it had the right to do so. Plaintiff was compelled to buy acid in the open market, and in this suit seeks to recover the damage it sustained by reason of the failure of defendant to furnish the acid according to the contract.

It is plaintiff's claim that it was not required to pay for the acid, according to the terms of the contract, until 10 days after its delivery to it at Midland and a reasonable time allowed for the inspection thereof. It also claims that by making the shipment on February 3d, defendant waived the default of plaintiff in not having paid for the car shipped within 10 days after January 22d, and that it thereby became estopped from cancelling the contract as it did on February 7th.

The court, over plaintiff's objection, permitted de-

fendant to offer proof tending to show a general custom of the trade by which the language of the contract, "Terms of payment: Net cash in 10 days," was construed to mean, payable in cash within 10 days after date of invoice or shipment. There are other facts which will be stated in the discussion of the questions presented.

After the proofs were concluded, the trial judge directed a verdict for the defendant, holding that it was justified in terminating the contract for the reason stated, and that there was no waiver of its terms which prevented it from relying on such cancellation as a defense in this suit. From a judgment for defendant entered on such verdict, the plaintiff appeals.

There are many assignments of error relating to the admission and rejection of testimony and to the rulings of the court, but the meritorious question presented is as to the action of the court in directing a verdict for defendant. As stated in plaintiff's supplemental brief:

"The two major questions in this case are (1) When was the payment due of the invoice of January 22, 1916? and (2) If the right to cancel the contract accrued to the defendant by reason of the delay in the payment of this invoice, did the defendant by its conduct waive that right."

The following sections of our uniform sales act, 3 Comp. Laws 1915, § 11832 *et seq.* (Act No. 100, Public Acts 1913), are pertinent and controlling so far as they apply:

"(11849) Sec. 18. Property in specific goods passes when parties so intend.

"(1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

"(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the

contract, the conduct of the parties, usages of trade and the circumstances of the case.

"(11850) Sec. 19. Rules for ascertaining intention. Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property' in the goods is to pass to the buyer:

"Rule 1. Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made, and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed.

"Rule 2. Where there is a contract to sell specific goods and the seller is bound to do something to the goods, for the purpose of putting them in a deliverable state, the property does not pass until such thing be done."

"Rule 5. If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon."

"(11873) Sec. 42. Delivery and payment are concurrent conditions. Unless otherwise agreed, delivery of the goods and payment of the price are concurrent conditions; that is to say, the seller must be ready and willing to give possession of the goods to the buyer in exchange for the price, and the buyer must be ready and willing to pay the price in exchange for possession of the goods."

"(11877) Sec. 46. Delivery to a carrier on behalf of the buyer.

"(1) Where, in pursuance of a contract to sell or a sale, the seller is authorized or required to send the goods to the buyer, delivery of the goods to a carrier, whether named by the buyer or not, for the purpose of transmission to the buyer is deemed to be a delivery of the goods to the buyer, except in the cases provided for in section nineteen, rule five, or unless a contrary intent appears."

1. When was the payment due? The terms of pay-

ment agreed upon were: "Net cash in 10 days." "Net cash," of course, means cash without the allowance of any discount. The cash was to be payable in 10 days. When shall these days be counted from? The plaintiff contends from the date of the delivery of the acid to it and its acceptance after test and inspection at Midland. The defendant insists, from the date of delivery on board its tank car at Detroit and the consignment of the car to plaintiff. Quoting from plaintiff's brief:

" 'Net cash' means cash on delivery. Then, 'Net cash in 10 days' means 10 days from delivery and such reasonable time to inspect."

There is much discussion by counsel as to when title to the acid passed to the plaintiff. While not conceding that the determination of this question is controlling, plaintiff's counsel contend:

"The title does not pass until such delivery and inspection and a reasonable time therefor."

The general rule is that title passes when the vendor has fully performed in the appropriation and delivery of the goods to the vendee, and delivery to a public carrier for transportation constitutes delivery to the vendee. There may, of course, be stipulations in the contract or circumstances attending its performance which indicate a contrary intention. *Wagar* v. *Railroad Co.*, 79 Mich. 648. This rule is, in effect, incorporated in the sections of the uniform sales act above quoted.

It is claimed by plaintiff that as the acid was to be of a particular commercial grade and strength, it necessarily had the right to inspect before acceptance and that title did not pass until such inspection and acceptance had been had. The argument based on this claim loses sight of the fact that title may pass even though the right to reject after acceptance be reserved.

The general rule above stated seems to have been adhered to many times by this court. Perhaps the leading case, and that which best exemplifies the rule, is *Kuppenheimer* v. *Wertheimer,* 107 Mich. 77 (61 Am. St. Rep. 317). The plaintiffs were wholesale clothing dealers in Chicago and shipped certain goods to defendant, a retail dealer in Detroit, on an order given from samples. The right to inspect was expressly agreed upon. Plaintiffs contended that delivery to the carrier completed the sale and passed title to defendant, while defendant claimed that the delivery to the carrier was merely for transportation and that title to him did not pass until he had received the goods and made inspection thereof. After announcing the general rule above stated, the court said:

"In the present case there is no evidence of an understanding that the property should not pass until inspected. Nothing was said about transporting to Detroit with a view to change of ownership only after acceptance. It is true that the goods were to be examined, and the price remitted at once, if found correct; but the agreement was silent as to this inspection being with a view to a change of ownership. The right to inspect before acceptance always exists, and a purchaser cannot be required to inspect at the shipping point, but is entitled to a reasonable opportunity after the arrival of the goods. *Fogel* v. *Brubaker,* 122 Pa. St. 7 [15 Atl. 692]; 2 Benj. Sales (Corbin's Ed.), §§ 910, 966; *Erwin* v. *Harris,* 87 Ga. 333 [13 S. E. 513]. If the goods are not up to the sample, the right to refuse them exists, which is, in effect, a rescission. The title passes upon delivery to the carrier, subject to this right, of which the purchaser may avail himself or not. Upon the facts shown, the court properly held that title passed by delivery to the carrier."

This decision has been cited and approved in *People* v. *Sheehan,* 118 Mich. 539; *Althouse* v. *McMillan,* 132 Mich. 145.

The application of this rule in no way deprived plaintiff of its right of inspection after the arrival of the car. In Williston on Sales, § 473, page 830, it is said:

"Where by the terms of the bargain the property was to pass before delivery to the buyer, the buyer has a reasonable time after delivery in which to examine the goods, and if they are not of a kind and quality ordered, he may then refuse to accept them, and thereby rescind the contract; but this does not prevent the title from passing, nor a recovery by the seller in an action for goods sold and delivered if in fact they do conform to the terms of the contract."

See, also, *Meagher* v. *Cowing*, 149 Mich. 416; *Illinois Glass Co.* v. *Horse-Radish Co.*, 166 Mich. 520; *Germain* v. *Loud*, 189 Mich. 38.

Is the rule thus announced and followed by this court in any way abrogated by the provisions of the uniform sales act above quoted? Rule 2 of section 19 provides, in effect, that the title shall not be deemed to have passed while "the seller is bound to do something to the goods, for the purpose of putting them in a deliverable state."

There can be no claim that this rule applies as the acid was in condition for use when shipped. Rule 5 of the same section reads:

"If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon."

The contract provides that the price shall be—

"Twelve dollars ($12.00) per ton, f. o. b. vendor's tank cars, Detroit, Michigan, less freight to Midland, Michigan."

Does this provision, which permits the plaintiff to deduct the freight to Midland, bring the shipment

within the above rule? We do not think the language used should be construed as an undertaking on the part of the defendant to deliver the product at Midland. While the plaintiff had the right to deduct the freight rate from Detroit to Midland, as counsel for the defendant pertinently suggest, plaintiff could have ordered this car sent to any point designated and, no matter where sent, to deduct the Midland rate of freight. The provision is specific that delivery shall be on defendant's tank cars at Detroit, and this was in no way controlled by defendant's agreeing that plaintiff might deduct the freight cost of transportation to Midland. Had plaintiff's necessities at some time required that a car go forward by express, there can be no claim that it would have had any right to deduct more than the usual freight charges. This construction is accentuated by the provision in the contract that—

"any decline or advance in freight rates or other transportation charges which may be made subsequent to date of this contract shall be for the account of and borne by the buyers."

See, also, Williston on Sales, § 280.

We must therefore conclude that delivery was made and that the title to the acid passed to the plaintiff when placed in its car and consigned for transportation to plaintiff at Midland. Section 46 (above quoted) so provides.

Delivery having been made to plaintiff at Detroit, the time of payment is fixed by section 42, wherein it is said that—

"Unless otherwise agreed, delivery of the goods and payment of the price are concurrent conditions."

We therefore find that the invoice was payable in 10 days from the date of delivery, January 22d.

Was plaintiff's failure to make payment within 10 days thereafter such a breach as entitled defendant

to cancel the contract? Section 45 of the uniform sales act provides:

"(11876) SEC. 45. Delivery in installments.

"(1) Unless otherwise agreed the buyer of the goods is not bound to accept delivery thereof by installments.

"(2) Where there is a contract to sell goods to be delivered by stated installments which are to be separately paid for, and the seller makes defective deliveries in respect to one or more installments, or the buyer neglects or refuses to take delivery of or pay for one or more installments, it depends in each case on the terms of the contract and the circumstances of the case, whether the breach of contract is so material as to justify the injured party in refusing to proceed further and suing for damages for breach of the entire contract, or whether the breach is severable, giving rise to a claim for compensation, but not to a right to treat the whole contract as broken."

The contract between the parties provides:

"Each shipment to be treated for the purpose of settlement, as a separate and independent sale, but if buyer fails to make payment for any materials furnished by vendor according to terms of sale, said vendor may defer additional shipments until payment is made, or may cancel this contract at his option."

The plain language of this provision gives the defendant the option when the buyer fails to make payment according to the terms of sale to delay further shipment until payment is made or cancel the contract. It exercised the option to cancel. Plaintiff's counsel in their brief say:

"The contract was for delivery in monthly installments, payments to be likewise made in installments. The failure to pay for one installment is not of itself such a breach as to justify, by the seller, a refusal to proceed further. A failure to pay sufficient to justify such cancellation must amount to a material breach of the contract. The determination of whether the failure to pay is such a material breach, 'depends on the

terms of the contract and the circumstances of the case' and is a question of fact."

They rely on the quotation from section 45. This section and the effect to be given to this language were considered by this court in *Cadillac Machine Co. v. Iron Co.*, 205 Mich. 107. In that case, the provisions relative to cancellation read:

"If the buyer fails to make payment when due, the seller shall have the right to cancel the contract or to postpone shipments of future installments until prior shipments are paid for."

In the opinion, also very illuminating on some of the other questions' discussed, Mr. Justice BROOKE, speaking for the court, said:

"It is further urged that this being a sale of goods by installment the seller cannot rescind or refuse performance unless the buyer's default is made under such circumstances as justifies an inference that he repudiates the entire contract, citing *West* v. *Bechtel,* 125 Mich. 144 (51 L. R. A. 791), and *Welsh* v. *Michigan Maple Co.*, 161 Mich. 16. The difficulty with this position is that the contract provides for more than a mere sale of goods by installment. It preserves definitely in the vendor the absolute right of cancellation:

" 'If the buyer fails to make payment when due.'

"In neither of the cases cited did the contract contain any such provisions. Leaving out of the question plaintiff's default as to the April, May and June quotas, it was nevertheless clearly in default on the March quota, when on July 10th the contract was definitely repudiated by the defendant. We are unable to see how the provision that:

" 'This contract for all purposes shall be treated as separate for each installment,'

"deprives the defendant of its right to cancel. This language must be read in conjunction with the earlier provision of the contract providing for cancellation of the contract or postponement of shipment of future

installments. It is true that because of its own acts such cancellation cannot be made effective as to the February quota, but we can see no reason why the plaintiff's default as to the March quota cannot be made the basis of a valid cancellation as to the balance of the contract."

2. Did the defendant by its conduct estop itself from exercising the option to cancel? It is insisted that at the time the default occurred, on which the right of cancellation is based, the defendant was itself in default in not having made the second January shipment and by making such shipment after plaintiff's default it waived the right to cancel for that reason.

The contract provided for distributing the 900 tons to be shipped during 1916 in approximately equal quantities each month. Plaintiff had made a purchase from defendant which was delivered in 1915. Defendant did not ship in January until plaintiff notified it to do so. In response to such notification, dated January 20, 1916, it shipped a car on the 22d, and on February 3d it shipped the other car of the January shipment.

In support of its position, plaintiff quotes the following from 24 Am. & Eng. Enc. Law (2d Ed.), p. 1105:

"The right to rescind must be exercised promptly upon the discovery of the facts authorizing rescission. Any unreasonable delay in rescission, or any further dealing or action in respect to the contract as though it were still in force amounts to a ratification or election to abide by the contract and is a bar to a subsequent rescission."

—and cites in support thereof, *Edward Thompson Co.* v. *Vacheron*, 125 N. Y. Supp. 939; *Capper* v. *Paper Co.*, 86 Kan. 355 (121 Pac. 519).

While the right to rescind must be exercised promptly, we fail to find any unreasonable delay on the part of defendant after discovery of the facts on which

the rescission was based.  The payment was due on February 1st, but, as defendant's counsel suggest, there was perhaps a question whether mailing it at Midland on that day would not be a compliance with the contract.  Defendant's witness testified:

"We shipped a car on February 3d.  I did not know at that time as to whether or not the payment which would be due February 1st was in the mail."

In the New York case above cited, which involved a sale of the publication of plaintiff, the payment became due on April 15th and a volume issued subsequently was sent to defendant on June 27th.  This was held to be such an unreasonable delay as waived the default.

In the Kansas case, delay in remitting was held to have been waived, but the facts as stated show many defaults and for a considerable period of time.  The evidence tended to show, as the jury found, that the defendant had repeatedly excused such defaults and made shipments long after they occurred.  The decision in this case but followed the rule well stated in 2 Black on Rescission and Cancellation, § 604, wherein it is said:

"If, however, there has been repeated delay on the part of the purchaser in making his payments, and habitual indulgence on the part of the vendor in giving him time, so that the course of their dealings might reasonably lead the vendee to believe that strict compliance with the terms of the contract would not in the future be insisted on, then it would be inequitable to permit the vendor to take sudden and sharp advantage of a subsequent default and declare a forfeiture forthwith; and in order to preserve his right to do so, it will be necessary for him to give the vendee notice that he intends thereafter to insist on strict punctuality in payment, and the notice must be so timed as to give the vendee a reasonable opportunity to comply with its terms."

Waiver implies the abandonment of a right by a person entitled to exercise it, who has at the time full knowledge of the existence of the fact on which the right depends. Such knowledge and the intention to relinquish the right must concur. The facts relied on must also show that such intent was communicated to and so understood by the party claiming the waiver. It is, in effect, the abandonment of a particular obligation and an agreement to substitute another in its stead. 2 Black on Rescission and Cancellation, § 605 et seq.; 40 Cyc. (Waiver) p. 252.

The facts are not in dispute. The burden of proof to establish the waiver was on the plaintiff. To maintain it, it must show that defendant acquiesced in the continuance of the contract after its officers knew that it had a legal right to rescind. We think there is no competent proof from which such an inference might be drawn.

Neither are we impressed by the claim that defendant, being in default in not having shipped the second January car during that month, could not take advantage of its right to cancel. It was not in default at the time it exercised the right nor when it first had such knowledge as justified the action taken by it. Under the terms of the contract and the undisputed facts we find that defendant was legally entitled to rescind the contract and that there was no error in the trial judge so holding and directing a verdict in its favor.

The judgment is affirmed.

BIRD, C. J., and MOORE, STEERE, BROOKE, STONE, and KUHN, JJ., concurred.

The late Justice OSTRANDER took no part in this decision.