BOWEN *v.* STOCKLIN.

1. EXCHANGE OF PROPERTIES—RESCISSION—RULES APPLICABLE—
   SALES.
   The general principles of rescission as to sales, etc., are
   alike applicable to exchange of properties.

2. FRAUD—DUTY TO RESCIND PROMPTLY.
   It is the duty of one who desires to repudiate or rescind
   because of fraud to act promptly upon discovery of the
   fraud, and not to proceed further under the agreement
   he desires to repudiate, or in any way recognize it as
   binding.

3. EXCHANGE OF PROPERTIES—RESCISSION—FRAUD—LACHES.
   Plaintiffs were not entitled to rescind a contract for ex-
   change of properties on the ground of fraud, where they
   took no steps to rescind for more than two years after
   they claim to have learned that they had been defrauded,
   and not until after defendants had begun foreclosure
   proceedings on a mortgage which they held on the farm
   they had conveyed to plaintiffs.

4. SAME—BURDEN OF PROOF—EVIDENCE—SUFFICIENCY.
   Testimony that plaintiff was a man of experience in real
   estate deals, while defendants were inexperienced and not
   versed in real estate values, that plaintiff took the initia-
   tive in the deal and made several proposals, one of which
   was finally accepted by defendants, who positively denied
   any misrepresentations on their part, *held*, insufficient to
   sustain the conclusion of the court below that plaintiff
   was deceived and induced to make the exchange of
   properties by false representations of defendants.

5. SAME—OPINION AS TO VALUE NOT FRAUD.
   A statement by defendants, made during negotiations for the
   exchange of their farm, that it was worth a sum in excess
   of its real value did not amount to fraud.

Appeal from Ottawa; Cross (Orien S.), J.   Sub-

mitted January 12, 1921.   (Docket No. 88.)   Decided July 19, 1921.

Bill by William T. Bowen and another against Emil Stocklin and another to rescind an exchange of real estate on the ground of fraud.   From a decree for plaintiffs, defendants appeal.   Reversed, and bill dismissed.

*Dean S. Face*, for plaintiffs.

*Charles E. Misner*, for defendants.

STEERE, C. J.   Plaintiffs are husband and wife, as are also defendants.   Plaintiffs' bill was filed May 29, 1920, to rescind an exchange of real estate between the parties made January 30, 1918.   The alleged ground of rescission is false and fraudulent representations made by defendants as to the amount of fertile and tillable land contained in a 40-acre farm located in Robinson township, Ottawa county, which they traded to plaintiffs for a house and lots in the city of Grand Haven.   Plaintiffs had decree in the trial court and defendants have appealed, claiming as ground for reversal that upon the record made plaintiffs are guilty of laches, fraudulent representations by defendants are not shown, and no offer was ever made to place defendants *in statu quo*.

Plaintiff Bowen was a man well along in years and of experience in real estate transactions both urban and rural.   He had lived and worked on farms in Benzie, Isabella, Montcalm and Ionia counties, owned real estate in Chicago and Grand Haven, had engaged in building houses in the latter city for sale, testified to selling six or seven houses and lots in Grand Haven, and admitted he had traded a Grand Haven house and lot to a Mrs. Conant for a farm in Robinson township.   The property he traded to defendants for their

farm, in the same township consisted of a house in Grand Haven he had built on two lots for which he paid $100. The property was mortgaged for $550 and he had listed it for sale with the Oakes Real Estate Company of that city at $1,900.

Defendants Stocklin owned and lived upon their farm of 40 acres in Robinson township upon which was a mortgage of $800. They had bought from a Mrs. Smith, who was Mrs. Stocklin's mother and had formerly lived on the place with her husband and family, but resided in Grand Haven at the time of this transaction. Bowen learned from her of this 40-acre farm and that it was for sale. They are not in accord as to how the interview arose or what was said but it is shown that he heard something about the farm being for sale at the real estate office where his property was listed, and pursued the subject by interviewing Mrs. Smith. At his request she went out to defendants' farm with him and a real estate agent whom he took along late in December, 1917. They went by sleigh, and, as plaintiff tells it, on the next day after it had snowed all night and the ground was covered with a foot of snow, which he emphasizes as a malign element in his trading project. The liveryman who drove them out said there was some snow on the ground, "it was bare here and there, but it was better for sleighing than anything else."

On their arrival at defendants' home Bowen met them for the first time, and first saw their farm as he states. It is undisputed that much of this 40-acre farm was part of the so-called "Blake marsh," too low and wet for cultivation. Of that fact Bowen was apparently advised before he saw the place. If not by his general knowledge of Robinson township, through which he had formerly ridden and in which he had owned a farm, he was at least fairly informed to that effect by Mrs. Smith. He testified that he

went out to this farm that day "for the purpose of looking it over to make an exchange of the property with Mrs. Smith," whom he also first met on that day, and she told him when they were on the way out there were between 22 and 23 acres of tillable soil on the 40 acres. On their arrival he looked the farm over to the extent he desired. Mrs. Stocklin testified she first saw Mr. Bowen out on the farm and he looked it over before he came in. He said that he went to the barn and looked at the buildings, which were as good as *they represented*, and the place looked to him "as though there was as much land as *they represented* it to be because there was a marsh covered with snow, and I thought it was a nice level field." In his repeated use of "they" he could not have truthfully meant defendants for the testimony is undisputed that he took his look at the place before he met them, and they made no representations whatever to him as to the conditions of the place while he was there. They did not then, or ever, make him any proposal, or offer, to trade or sell him their farm, so far as this record shows. He on that day proposed a land trade, telling them he owned some Chicago property for which he asked $4,500 and would in exchange allow them $3,000 for the farm. Defendants told him they did not want to sell the place then or make the exchange he proposed, but would think it over and let him know in a week. Nothing was said about any Grand Haven property at that time. Bowen's testimony upon that transaction is in part as follows:

"He was not out further than the barn which stands about four rods back of the house when he was out there the first time, because Mr. Stocklin wouldn't agree to anything and at that time he had no idea any deal would be perfected. Mr. Stocklin came in the house shortly after he got there. He never had a talk with Mr. Stocklin. The real estate man tried to get in some agreement, but there was nothing done.

He had some talk there that day with Mr. Stocklin but they didn't talk about dealing in any way. He didn't exchange a word with Mr. Stocklin that day about the farm. He doesn't think he talked with Mrs. Stocklin at all that day. He thinks he did say something to Mr. and Mrs. Stocklin that day about some Chicago property he owned and valued at $4,500. He thinks he did talk about the Chicago property to Mr. and Mrs. Stocklin.   *   *   *   He would not say that there wasn't anything said about letting him know in a week about the Chicago property. He never expected to see or hear from Mr. Stocklin again as far as that deal was concerned. In about a week Mr. Stocklin did come to Grand Haven. Later he met the Stocklins at Mr. Oakes' office. Up to this time Mr. Stocklin had not said a word about his farm. This time in Oakes' office Mr. Stocklin told him he would not trade for the Chicago property. At this time he told the Stocklins that he had a house and lot in the city of Grand Haven that he might exchange for the farm. The Stocklins told him they would go out and look at it. After they had looked at it he met them at Oakes' office and they entered into an agreement this second time."

This second interview was on January 4, 1918. Defendants on that day went to Grand Haven, met Bowen in Oakes' real estate office and informed him they did not wish to trade their farm for his Chicago property. He then told them he had a house and lots in Grand Haven valued at $1,900 and proposed an exchange of it for their farm. The real estate agent Oakes then took them out to look at it, and on their return to the office they accepted his offer. A written agreement was thereupon entered into by which plaintiffs were to give defendants the house and lots free of incumbrance and $300 in cash for their farm, subject to the $800 mortgage then upon it. Of this transaction Bowen was asked and answered:

"And they told you they were satisfied after they had looked at the Grand Haven property to accept the terms you put up to them in Oakes' office?

"*A.* Yes, sir, that is very true.

"*Q.* And those terms were put in writing (offered in evidence for defendants) ?

"*A.* This written agreement was never carried out."

Defendants then went home and on receipt of a letter from Oakes advising that Bowen would meet them at his office in Grand Haven on January 29, 1918, to carry out the terms of that contract, they went there on that day and were met by Bowen, but he refused to consummate the deal and defendants left the real estate office. After they had gone plaintiff picked them up on the street, took them into the People's Savings Bank which held the $550 mortgage on his property and renewed the subject, telling them they could make the deal themselves without Oakes and save the commission. They at first told him the deal was off and they were going home, but he persuaded them to stay over until the next day, giving them money to pay their expenses as they testify, and to meet him for further negotiations at the office of a Mr. Dickinson. This they did and he made a new proposal based on the same trading prices for the properties, but instead of clearing the house and lots of the $550 mortgage and paying them $300 in cash he advanced what he claimed was a more advantageous proposition, and prevailed on them to accept, instead, a second mortgage for $850 on the farm they traded him which he pointed out would be paying them 6% for two years. This being finally agreed upon the papers were made out by Dickinson and the exchange consummated. Possession of the property they had exchanged was retained by each until spring.

Plaintiff went out to the farm again in March while defendants were yet there and stayed overnight. He said that was after the snow began to break, but does not disclose what observations he then made. He moved onto the farm April 1, 1918, and testified

that he then found he had been beaten, only 4½ acres of land being fit for cultivation and "he didn't see where the property was worth to exceed $1,000;" that in May, 1918, he informed Mrs. Stocklin they had misrepresented the property to him and he was badly beaten and told defendants "he wanted to clear the thing up and was losing money but he was willing to give them $400 and clear up the property but they would not accept it." He, however, gave no notice of any intention to rescind the contract, and took no steps to that end until two years later, after defendants had started to foreclose the mortgage he had given them on the place. He testified that he lived on the farm for a year, rented it for a year from the fall of 1918, moved off in the spring of 1919 and since the fall of that year "left it in the care of Mr. Scott whose lands join the place and he had the use of the barn and had the farm in his care until he moved away;" that he went over in May, 1920, to let the place to a Mr. Halhover and found Mrs. Stocklin there, who had begun foreclosure against him, and told her that he owned the farm and she didn't have any right there. Mrs. Stocklin's explanation of her presence there was that things were being destroyed and carried away and she went out for a couple of days under the advice of their attorney to look after things and stop waste, for protection of the mortgage they were foreclosing.

We find difficulty in following the conclusions of the trial court that it appears by a preponderance of evidence Bowen was deceived and induced to make this trade by false representations of defendants. His statements as to the misrepresentations are met by positive denials on their part. Mr. Ringlebery, an apparently disinterested business man of Grand Haven for 15 years, testified that Bowen told him in the summer of 1918 he had made a deal with the

Stocklins, was satisfied with the place, had got rid of his property and made a little money.

The testimony is undisputed that Bowen was a man of varied experience in real estate dealings, both selling and trading. Defendants had no experience in that line beyond buying their 40-acre farm from Mrs. Stocklin's mother. Neither of them was versed in real estate values, either city or country. Stocklin was a foreigner whose knowledge of English was limited. He had never lived or worked on a farm until they moved upon this one the year before, and knew little of acreage, farming lands or farm values. They took no initiative in any of the negotiations and never made him an offer. He was in the business, on the lookout for a trade or sale, followed them up as a prospect and made them three different propositions for an exchange,—the first when he went out to the farm in December, 1917. This they declined on January 4, 1918. He then made them another offer which they accepted, but when the parties met on January 29th to consummate that deal he refused to carry it out and they started home. He then followed them up and made another offer which they were induced to accept and the conveyances consummating it were executed January 30, 1918. These sequential propositions and agreements were all on his initiative. He was a man of affairs who greatly excelled defendants in knowledge and experience in that line of business. He started negotiations and kept them going until he made a deal. They proposed nothing and simply agreed on two occasions to the terms he formulated and proposed to them. Between such parties and under the circumstances shown here it taxes credulity to accept his claim that he was deceived and persuaded to make the third and last deal he put up to them through misrepresentations as to the character and value of this farm, which he had gone out to look over with

a trade in mind, made by defendants who were before negotiations started total strangers to him and with whom he was dealing at arm's length.

Against his testimony as to misrepresentations they make total denial. As to the condition and values of the properties exchanged the testimony is in conflict. Each claims the other's trading price was beyond the then actual value of the property. But conceding Bowen's claim that he fell a victim to defendants' false representations, he took possession of the farm in April, 1918, and has lived upon or rented it ever since. He testified that as soon as he went upon the place on April 1, 1918, he knew he had been defrauded, but he took no steps to rescind until May, 1920. He offers no excuse for the delay. It is claimed he permitted the farm to run down and deteriorate in value. He is not shown to have made any improvements upon it. He makes no offer to place defendants *in statu quo,* beyond an offer in the amended bill to re-convey. Defendants moved into the house they received in exchange on April 1, 1918, which they claim was then in need of repairs and scarcely habitable, and have resided there since, intending to make it their permanent home. In the meantime they have expended upon it labor and money, radically changing its appearance and value. The house was located in a sparse outskirt of Grand Haven about a mile and a half from the main part of the town, without electricity, gas, water, sidewalks or sewers, on two lots so low as to cause water to stand in the cellar. Defendants filled up the lots to a proper level, made a lawn, planted trees, repaired and painted the house, built outbuildings and radically changed the character of the place, in which improvements Stocklin testified he had expended about $700 besides paying taxes and interest on the mortgage. During the two years they were making these expenditures and fixing up the place

as their home Bowen, who testified he had discovered they had defrauded him as soon as possession was given, took no steps to rescind.

The general principles of rescission, as to sales, etc., are alike applicable to exchange of properties.

Plaintiffs' claim of fraud is partly predicated on Bowen's testimony that defendants falsely stated their farm was worth $3,000. That amount was adopted by Bowen as the trading price of the farm as was $1,900. for the house and lots, both on his proposal. Defendants deny having stated the farm was worth that amount of money, but if they did such statement as to value during negotiations did not amount to fraud. *Hammer* v. *Martin*, 205 Mich. 359.

Plaintiffs took no steps to rescind until defendants commenced foreclosure of their mortgage.

"It is also a general principle that a person who knows that he is entitled to rescind a contract, cannot wait until suit is brought for payment or other enforcement of the contract and then set up his grounds of rescission, or at least, such a course is regarded with great disfavor by the courts, if there has been any considerable lapse of time since his discovery of the facts. As stated in one of the cases, he cannot lie by and enjoy the benefits of the contract knowing all the time of the existence of fraud or other ground of rescission, and then claim to take advantage of it when the other party seeks the enforcement of the contract." 2 Black on Rescission and Cancellation, p. 1276.

*Vide*, also, Hammon on Contracts, § 124, and cases there cited.

This court has consistently recognized it to be the duty of one who desires to repudiate or rescind because of fraud to act promptly upon discovery of the fraud, and not to proceed further under the agreement he desires to repudiate or in any way recognize it as binding. In the early case of *Wilbur* v. *Flood*,

16 Mich. 40, the court said, speaking through Justice CAMPBELL:

"It is an inflexible rule that a party complaining of fraud must be guilty of no unreasonable delay in repudiating and getting rid of his contract. Where his object is to rescind it and reclaim his property, he is bound to lose no time unnecessarily in his action to that end."

"The decisions on fraud all hold in this State that a party defrauded is bound to use active diligence, and to use no unavoidable delay in complaining. (Citing authorities.) Any delay which is not reasonably necessary, under all the circumstances, is a fatal delay." *Lewless* v. *Railway Co.*, 65 Mich. 292.

In *Draft* v. *Hasselsweet*, 194 Mich. 604, sixteen Michigan cases are cited in support of the following statement:

"This court has said again and again that if one has been defrauded he must complain of it promptly."

From a careful consideration of this record as a whole, and particularly the undisputed facts in connection with the testimony of Bowen himself, we are of opinion plaintiffs have not under the law of rescission established their right to equitable relief.

The decree of the lower court must therefore be set aside and one entered in this court dismissing the bill of complaint, with costs to defendants.

MOORE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.

The late Justice BROOKE took no part in this decision.