## COHN et al. v. KRAMER et al.

### No. 8986.

Circuit Court of Appeals, Sixth Circuit.

Jan. 15, 1942.

Robert N. Gorman, of Cincinnati, Ohio, and Joseph B. Beckenstein, of Detroit, Mich. (Paul J. Wieselberg, of Detroit, Mich., on the brief), for appellants.

Ralph Routier, of Detroit, Mich., and Frank E. Wood, Jr., of Cincinnati, Ohio, for appellees.

Ralph E. Routier, of Detroit, Mich., on the brief, for appellees Herman Kramer and another.

Robert S. Marx and Frank M. Wiseman, both of Detroit, Mich., on the brief, for appellee B. C. Schram.

Before ALLEN, HAMILTON and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

This appeal challenges a decree cancelling a lease and its modifications for fraud in the inception thereof, and for substantial breach of performance.

Appellants, lessees of a moving picture theater owned by appellees Kramer, filed a bill in equity alleging defects in structure and maintenance of the building and its equipment, in part due to the owners' negligence, and praying for a reduction in rental due to reduced seating capacity of the theater, and other equitable relief. Appellants brought in as a party defendant the receiver of the First National Bank—Detroit, who holds an assignment of the Kramers' interest in the lease as security for an obligation of the Kramers to the bank.

The Kramers' answer denied in substance the material allegations of the bill and stated that the reduction in seats was requested by appellants and acceded to by appellees in order to reduce operating expense for appellants. By cross-bill they prayed for cancellation of the lease and its renewals because of fraud and substantial breach. The District Court dismissed the bill and granted the prayer of the cross-bill.

At the outset we consider appellants' contention that the District Court had no jurisdiction, alleging that the claim of the receiver was eliminated during the trial

and before the entry of the decree. The bill was filed in the state court and the receiver caused the removal of the case to the federal court. After the cross-bill was filed, the receiver filed various pleadings in which he asked that appellants' bill be dismissed, set up the interest of the bank in the lease, and prayed that its interest be protected by appropriate decree in event of cancellation.

The facts as to the receiver's interest were admitted. It therefore was not necessary for him to introduce any testimony. He appeared through counsel at the trial and renewed the applications made in the pleadings. No definite agreement was reached on the appropriate means of safeguarding his security.

Since the controversy between the Kramers and the receiver was not eliminated during the trial, and since a controversy existed between the receiver and the appellants, the District Court had jurisdiction to enter the decree, and the motion made by appellants, after the opinion was filed, to dismiss as to the receiver and to remand the controversy to the state court, was rightly denied.

The lease covered a motion picture theater of some 1,700 seating capacity called the Kramer, located on Michigan Avenue in Detroit, six blocks east of Livernois Avenue, situated in a business block owned by the Kramers, which also contained offices, apartments and stores. Appellants, experienced motion picture operators, own two theaters on Michigan Avenue in the vicinity of the Kramer, the Senate, with a seating capacity of about 1,200, one block west of Livernois, and the Crystal, with 580 seating capacity, about a mile east of the Senate. The Senate, Kramer and Crystal are in the same zone for booking films.

The negotiations were handled for the lessees by appellant Cohn, and for the owners by Herman Kramer. At the time, Sol Krim held a lease on the Kramer, which was surrendered for $10,000, of which sum the Kramers supplied $4,000, and Cohn and Shevin $6,000, to be reimbursed through application on rentals as they came due. Because, as Cohn stated, Krim would not sell his interest if he knew he was selling to Cohn, appellants desired the matter to be kept secret, and the sale was handled without disclosure of the principal. Krim assigned his interest to Julius L. Berns, who in turn assigned the lease to Cohn and Shevin. With certain modifications, it was accepted by all parties on May 26, 1936. At the same time the Kramers granted Cohn and Shevin an option to extend the lease for an additional three years. The Kramers agreed to a five-year renewal on October 27, 1937, pursuant to the lessees' exercise of an option in the original lease, and on November 23, 1938, agreed that the three-year extension option contemplated that the extension begin at the end of the second five-year term.

Condemnation proceedings to widen Michigan Avenue, previously instituted by the city of Detroit and taken into consideration in the lease, caused the closing of the Crystal and many places of business in that vicinity in the fall of 1937. The Kramer continued to operate until February, 1938, when the Kramers reassumed possession during the widening of the street. As a result of the condemnation, 53 feet were cut off the Kramer lobby, and a small corner was cut off the Kramer auditorium. After extensive remodeling by the Kramers, entailing an expenditure of approximately $16,000, the Kramer was reopened February 11, 1939. Both Cohn and Shevin agreed that the remodeling made the Kramer modern and attractive. Cohn admitted that the remodeling made it necessary to modernize the Senate, or else "everybody would be coming to the Kramer." After the remodeling Cohn raised the price of admission, which was the same at both theaters. From that time on the quality of the films shown at the Kramer began to deteriorate rapidly. Very few class-A pictures were shown. Vaudeville performances of a questionable nature were presented. Certain shows were for adults only, and many of the pictures featuring the better-known film stars were no longer shown at the Kramer. The profits immediately began to decline. The explanation made by Cohn and his manager, Pival, of the inferior grade of pictures was in substance that the Polish people of the neighborhood were not able to appreciate good films; but three Polish women testified that they left the Kramer because of the inferior quality of pictures. One mother protested to the manager against the vaudeville performances, saying that it was "terrible for young children to see all that jitter-bugging." Cohn and Shevin ascribed the declining profits to structural defects which they claimed were the fault of Kramer.

Appellants in the bill claim damages upon the ground that during the time the theater was closed, the seats were

placed by Kramer in an open storeroom, exposed to the weather so that the glue deteriorated, the metal rusted, and the plywood of the seats was split. Kramer denied this, and there is a sharp conflict in testimony as to how the seats were cared for during remodeling. Experts on both sides differed not only as to the condition of the seats, but also as to the alleged poor condition of the acoustics, the ventilation, the floor of the theater, and the lack of an accessible manhole in the oil tank for heating. Engineers and architects of conceded ability declared under oath that the claimed defects did not exist. Under the lease the lessees were bound at their own expense to maintain the interior of the premises, together with all personal property, fixtures and equipment. Without further discussion, it suffices to say that the decision that appellants had not proved their case as to these matters is clearly correct.

Another complaint set forth in the bill arose from the fact that the lease provided that if the seating capacity was reduced in the reconstruction due to the street-widening, the minimum rentals of the lease should be proportionally reduced. It was shown that the admitted reduction in the number of seats as distinguished from seating capacity grew out of the fact that before the widening of the street, Cohn asked that more than a hundred seats be shut off from the theater balcony by a wall, in order to cut down the number of seats to 1,500 so that under the rules of the "labor union," a second operator would be eliminated, with a saving of about $4,500 a year. Kramer complied with this request as a favor to Cohn, and no notice was given him that an application to reduce rent would be made on that ground. After the remodeling, although more space was available for seats than before, Cohn did nothing about filling that space, and the number of seats was kept near 1,500. Cohn admits all of the circumstances as stated by Kramer, except that he says that the seats were to be removed "until the widening of Michigan Avenue." It does not appear that he asked for the restoration of the seats after the widening, nor does Cohn deny asking Kramer that the number be reduced under 1,500 after the remodeling. It seems incredible that a saving of about $4,500 yearly would be requested only until the avenue was widened, and we conclude that Kramer's account of the transaction is correct. Moreover, the seating capacity was not reduced by the remodeling, which was the contingency provided for in the lease. The provision of the lease relied on in the application for reduction of rents clearly relates to reduction of seating capacity by the lessor at his own instance and not at the request of the lessee. Here the reduction in the number of seats was secured by appellants themselves, at their urgent insistence, and equity therefore will not grant them a reduction of rentals under the lease. The District Court rightly dismissed the bill upon the ground that its claims were not established by the proof.

A more complicated question arises as to the holding of the District Court under the cross-bill, that the appellants' fraud, deceit, misrepresentation of material existing facts and concealment, were the inducing causes of the lease, its modifications and extensions. The court held that these representations were made wilfully, deliberately, with knowledge of their falsity, with the intent to cause the Kramers to rely and act thereon to their damage; that the Kramers did rely and act thereon, and that the appellants had no intention of ever performing the terms, covenants and conditions of the lease, its modifications and extensions.

Appellants make numerous assignments of error with reference to the decree of cancellation, of which only the principal ones merit notice here. They claim that there was no fraud; that the misrepresentations claimed by Kramer were never made, or if made, were not admissible in evidence; that they were promissory and not relied upon by Kramer, and that the Kramers suffered no damage thereby, and also that the evidence conclusively establishes that Cohn intended at the time of the execution of the lease to perform the promises made.

Prior to the negotiations between Cohn and Kramer which led to the execution of the lease, Cohn had talked to Moon, then an executive of the Co-operative Theatres of Michigan, Inc., about building a theater with 1,700 to 1,800 seating capacity. Cohn and his father had bought land on Michigan Avenue with this purpose in view. Cohn discussed with Moon the acquisition of the Kramer, evidently considering that it would be an advantage not to build a new theater, which would put three large houses relatively close together on the street. Sometime thereafter Cohn, on behalf of the appellants, and Kramer, on behalf of

the lessors, had numerous telephone conversations and personal conferences about leasing the theater to Cohn and Shevin. Kramer's chief concern was that the better run of films should be shown by Cohn if the lease was executed. Krim had not been able to secure first-run pictures because he was not a member of the Co-operative. Cohn was a member, and under the control obtained through group purchasing by the Co-operative, could get the film products of substantially all the major and independent producers, while non-members could only secure them after they had been first offered to members and exhibited or refused by them. Cohn's influence had prevented Krim from securing membership in the Co-operative, with resultant hostility between Krim and Cohn.

Cohn took Kramer to the office of the Co-operative where they had a conference with Moon, who assured Kramer that Cohn could obtain the first-class products essential to successful operation. Kramer testified that Cohn said that the Kramer would be given the first-run pictures because it was the biggest house; that the Senate was doing so much business on the best pictures that its capacity was inadequate, and that Cohn would keep competition out of the zone by controlling the picture situation. It was understood by the parties that Michigan Avenue was to be widened, and Cohn said that this would cut down the lot of the Crystal and that he would not rebuild that theater. Kramer's testimony as to these conversations is corroborated by Moon. Moon stated that Kramer discussed the fact that his lease with Krim had been unsatisfactory, due to Krim's inability to get sufficient good pictures, and that Kramer said "if Cohn could and would get them and book into the Kramer theater better pictures and more of them than Krim," he was "willing to make a lease with Cohn." Cohn assured Kramer, in Moon's presence, that he would give the theater good operation in every respect, including pictures. Kramer testified that he was willing to give the lease upon these assurances. He wanted the lease to provide that the Kramer should receive class-A pictures. Cohn admits this, but refused to incorporate such a provision because he said that there were not enough A pictures to do so. The lease provided, however, for higher minimum rentals than those which had been paid by Krim, and contained the following provision:

Paragraph 2(t) "It is mutually agreed that the parties of the second part (Cohn and Shevin) shall use their best efforts to obtain product and adopt a management policy which will assure a successful operation of the theatre leased hereunder, where such efforts are under the control of the parties of the second part."

Kramer made no complaint about the management during the operation from June, 1936, up to the time of closing in February, 1938. While the "overages," or receipts requiring additional rentals were not great, Kramer felt that in view of the torn-up condition of Michigan Avenue, some decrease was to be expected in the theater receipts.

The controlling question of fact is whether misrepresentations were made as claimed by Kramer and denied by Cohn and Shevin. Shevin's testimony sheds little light upon this question. He was the bookkeeper and concededly the negotiations were handled by Cohn, the "active theatrical man." Shevin was not present at the interview in Moon's office. Cohn did not deny taking Kramer to see Moon. He admitted that Kramer asked to have the contract specifically provide that class-A pictures should be shown at the Kramer, and also that he made the Kramer a member of the Co-operative so that it was in a position to receive class-A pictures. Cohn was an evasive witness and upon certain subjects he told an incredible story. In support of his contention that he did not seek out Kramer, but that Kramer got in touch with him and requested him to take over the Krim lease, Cohn stated that he did not know where to reach Kramer, although he knew where Kramer operated a furniture business, and where he lived. Cohn admitted that he tried to find Kramer many times, but said he did not know that Kramer was listed in the telephone book. He had no knowledge, he testified, of the attendance at the Kramer at the time that it was managed by the Kramers or by Krim. He stated positively that he did not know the seating capacity of the Kramer. He could not recall whether he had made an inventory before entering into the lease, although the lease provided for an inventory by the lessee. Later he said he made one "in his mind." The trial judge, who saw the witnesses, evidently disbelieved Cohn's testimony on material points.

Kramer's account of the representations is supported by the testimony of Berns, the

attorney who represented Kramer and acted in the assignment of the Krim lease as the agent for the undisclosed principal. He at no time represented Kramer in the present controversy. Berns said that in his presence Kramer expressed his dissatisfaction with Krim's operation of the theater, the principal objection being that Krim was not able to, or did not furnish the product essential to successful operation. Cohn then said that the reason Krim could not be successful was the fact that Krim did not belong to the Co-operative and could not secure products which were controlled by the Co-operative. Cohn said that he had control of that booking zone for the early run of pictures from the Co-operative; that he could furnish the type of products required; that Krim could not get them, and that therefore Krim was "more or less" at his "mercy." Berns then brought up the fact that Cohn and Shevin owned both the Senate and the Crystal, and questioned whether Kramer would not be falling "into the same pit" that he had "fallen into with Krim." He suggested that Cohn could afford, since he controlled the district, to take the Kramer and close it up or run it without putting forth his best efforts. Cohn stated that he would not be that foolish, as he was putting up part of the purchase price for the assignment of the lease, and since the Crystal was about to be demolished, due to the widening of Michigan Avenue, he could make money for himself as well as for Kramer, and that he would "adopt a policy in the operation of the Kramer similar to that of the Senate." He stated specifically that he would "see to it that there was no discrimination" between the Kramer and the Senate.

Kramer is also supported by the inherent probability of the story. The assertion that such representations were actually made dovetails in with the fact situation, for it does not seem likely that Kramer would have advanced $4,000 to buy up Krim's lease, the objection to Krim clearly being that he had been unable to show good films, unless upon this specific point he had a definite assurance that Cohn both could and would secure for the Kramer the better class of films. We conclude that clear and convincing evidence was presented that the assurances were made and were relied upon by Kramer. We are not compelled to resort to the established rule that a decree of the District Court, who heard the testimony, is not to be disturbed except

for clear mistake. Chinn v. Llangollen Stable, Inc., 6 Cir., 109 F.2d 66. A reading of the entire testimony amply supports the decision of the District Court that upon the material controverted points the truth was told by Kramer and his witnesses, instead of by Cohn.

 Consideration of the promissory representations is objected to upon the ground that all prior negotiations are merged in the written lease. We think they are plainly admissible to explain the meaning of paragraph 2(t) of the lease quoted above. This vital paragraph is loose and general in its provisions, and the antecedent of the word "which" is ambiguous. We think it is clear from the circumstances surrounding the adoption of paragraph 2 (t) that it evidenced an agreement on the part of the lessees "to use their best efforts" "to obtain product" which would "assure a successful operation" of the theater, rather than, as appellants claim, a mere agreement to obtain sufficient product to maintain uninterrupted operation.

██ Damage is also conclusively established. From February to July, 1939, when Cohn put into full effect his policy of depriving the Kramer of the better pictures, the monthly profit and loss statement of the Kramer shows a constantly increasing loss, ranging from about $250 gain in February to about $1,200 loss in July. The comparative gross revenue statement for the Kramer and the Senate in 1939 was about $54,000 for the Kramer and about $152,000 for the Senate, if allowance is made for the time in that year when the Kramer was not operated.

The Crystal, meanwhile, which Cohn had said he would not reopen after the widening of Michigan Avenue, had as a matter of fact been rebuilt by Cohn and Shevin in the immediate vicinity of the Kramer. The total for the year 1939 for the Crystal was a profit of $15,000, for the Senate a profit of $41,000, and for the Kramer a loss of $9,968. Damages were allowed in the amount of $7,600. We find no reversible error in this portion of the decree. It is less than the damages actually suffered.

The District Court's finding that the appellants had no intention of performing the terms, covenants and conditions of the lease, its modifications and extensions, is also amply sustained by the record.

The extension of the lease was executed in October, 1937. The promises and repre-

sentations which formed the basis of the original assignment in 1936 also formed the basis of the extension of the lease in 1937. In 1936, according to Cohn's statement, and, we infer, after the time that the Kramer was made a member of the Co-operative, Cohn requested the Co-operative at various times for permission from the exchanges to show pictures at the Senate that were bought for the Kramer. Moon testified that this happened, and stated that in 1937, prior to the extension of the lease, Cohn told him it would be desirable to make contracts for the coming year that would give him the privilege of showing pictures from all the companies at either the Kramer or the Senate. Such contracts were made. Cohn admits making these contracts and concedes that under them he could play the pictures in either house, according to his best judgment. Thereafter Cohn represented to Kramer that he was unable to secure better pictures for the Kramer, and it appears that these arrangements were kept secret. It is therefore established by Cohn's own admission that prior to the extension of the lease in 1937 he not only had discriminated against the Kramer in the selection of certain pictures, but had also arranged with the Co-operative to make it possible in all of the bookings to discriminate against the Kramer. He did not put this policy into full effect immediately after the execution of the contracts, doubtless because the remodeling of the Kramer to be paid for by appellees was contemplated after the widening of Michigan Avenue, and Cohn desired not to antagonize Kramer before this work was done. As soon as the theater was reopened, however, he put the policy into effect more openly. An exhibit compiled by Moon shows that in the Senate, from February, 1939, to April, 1940, 62 class-A pictures, 65 B pictures, and 77 C pictures were shown, while at the Kramer during the same period 7 A, 26 B, and 138 C pictures were shown.

While Moon admits that in making the compilation he did not in all cases follow the classification of the producers, he was fully qualified as an expert in the motion picture field and testified with candor. In view of this, and of Cohn's admission that he transferred pictures designated for the Kramer to the Senate, and later had contracts drawn so that he could manipulate the pictures as he deemed best, we conclude that Moon's compilation is substantially correct. It must be remembered that on this branch of the case the defense of the appellants is not that the Senate was not preferred in the pictures which it received. This fact is in substance admitted by Pival, manager of the Kramer, and by Cohn himself. The defense is that the clientele of the Kramer wanted a lower type of product.

While, as contended by the appellants, pictures are classified according to their cost, this record shows that the A and B pictures are in the better class. It also shows that many of the pictures presented at the Senate had been shown at the first-run movie theaters in the center of the Detroit theater district, but that relatively few of the list shown at the Kramer after February, 1939, came from the same group. During this period the advertising, which was managed by Cohn, discriminated against the Kramer in favor of the Senate both in the amount of advertising copy, its size on the page, and the position of the advertisement in the newspapers. The film costs submitted by appellants show that from January, 1939, to June 21, 1940, Cohn expended in the Senate about $57,000; in the Kramer, about $34,000; in advertising for the Senate about $10,000; for the Kramer, about $5,000. Over $33,000 was spent for premiums, "giveaways," etc., at the Senate, and $908 at the Kramer. While some $6,000 more was spent for vaudeville at the Kramer than at the Senate, the Kramer's patrons objected to the vaudeville shown. Discrimination was also practiced by Cohn in closing the Kramer to Saturday matinees and posting signs on such occasions to the effect that the Senate was open.

■ The appellants claim that the loss of patronage was due to the defects in ventilation, acoustics, seating, etc., described in the bill of complaint; but no customer appeared to testify that loss of patronage was due to these elements, while four former patrons of the Kramer stated that they left the Kramer and went to the Senate because the latter showed a better class of pictures. Under Michigan law the representations proven constitute fraud in the inception of the contract, for which cancellation will be decreed. Kefuss v. Whitley, 220 Mich. 67, 189 N.W. 76; Fred Macey Co. v. Macey, 143 Mich. 138, 106 N.W. 722, 5 L.R.A., N.S., 1036; Witte v. Hobolth, 224 Mich. 286, 195 N.W. 82; Conger v. Thomas & Lane, 258 Mich. 702, 242 N.W. 815. Cf. Rutan v. Straehly, 289 Mich. 341, 286 N.W. 639.

Appellants, however, claim that the Kramers cannot recover because the promissory fraud rule does not apply unless at the very time of making the representations, or immediately thereafter, statements or acts of the parties indicate that there was no intention on their part to carry out their representations. Danto v. Charles C. Robbins, Inc., 250 Mich. 419, 230 N.W. 188. This case, however, supports the appellees, because the only reasonable inference to be drawn from the evidence in the present case is that the promissory representations were made with no intention to perform them. It is clear that discrimination between the Senate and the Kramer commenced immediately, for at no time under Cohn's management did the Kramer receive a fair share of the better class of pictures or a comparable proportion of major productions. The Danto case does not require admission of fraudulent purpose by word of mouth. Here Cohn made secret arrangements prior to the lease extension, through the Co-operative, (1) to transfer pictures bought for the Kramer to the Senate, and (2) to make the contracts cover both the Kramer and the Senate, so that he could manipulate the pictures at will. These facts afford ample support to the finding of the District Court that Cohn never intended to carry out the contract either originally, or when he applied for its renewal in 1937.

██ But appellants also claim that the appellees have waived their right to cancellation (1) by extending the lease; (2) by failure to protest against the alleged fraudulent conduct until July, 1939, and (3) by demanding rent up to the time of trial.

This claim of waiver is based upon an .erroneous statement of facts. While the lease was executed in 1936, extended in 1937, and recognized a third time by the Kramers in a so-called "clarifying" agreement executed in November, 1938, Cohn's policy of discrimination was first put into effect, so far as Kramer knew, in February, 1939. The manipulation of the films in favor of the Senate, which Moon describes and Cohn concedes, was concealed from Kramer. Waiver is the renunciation of a known right (Dow Chemical Co. v. Detroit Chemical Works, 208 Mich. 157, 175 N.W. 269, 14 A.L.R. 1200), and Kramer could not waive the right of cancellation prior to February, 1939, because it was after the reopening of the theater that he was first aware of the breach of paragraph 2 (t) by Cohn and the fraudulent character of the representations.

Cohn and Shevin assert that no complaint was made against the films until July, 1939. But Kramer's testimony that he protested against the picture shown on the reopening night, February 11, 1939, is supported by Pival, manager of the Kramer, employed by Cohn and hostile to Kramer. This protest was based upon Kramer's conviction that English films were not successful in that neighborhood, and he states that thereafter he repeatedly complained as to the quality of the films, and received repeated assurances from Cohn that the situation would soon be better.

Kramer's story upon this point is again corroborated by its inherent probability as well as by Cohn's lack of candor. After seeing Krim fail in his management of the theater because of the nature of the pictures exhibited, and after demanding that the lease itself should make provision for A pictures for his theater, and receiving the assurances testified to by Moon and Berns, it was reasonable that Kramer should be alert to the class of pictures shown. He could not fail to be aware of the diminishing receipts. Cohn admits, and his records demonstrate, that the attendance and profits did decrease. All of these circumstances cause us to conclude that Kramer actually protested as to the discriminations against his theater repeatedly from February 13, 1939, up to the filing of the bill on August 29, 1939.

██ The Michigan law with reference to laches or waiver in fraud cases is stated in Dorgan v. Birney, 272 Mich. 145, 151, 261 N.W. 278, 279, where the court quotes with approval the following statement from Bayley v. Friedberg, 226 Mich. 125, 197 N.W. 559:

"This court has many times held that one seeking relief for fraud must act promptly after its discovery. Draft v. Hesselsweet, 194 Mich. 604, 161 N.W. 864; Bowen v. Stocklin, 215 Mich. 341, 183 N.W. 946. The mere lapse of time, however, is not sufficient to constitute laches. Backus v. Backus, 207 Mich. 690, 175 N.W. 400; Walker v. Schultz, 175 Mich. 280, 141 N.W. 543; Humiston, Keeling & Co. v. Yore, 181 Mich. 629, 148 N.W. 266. The delay in moving may always be explained, and, if

**800**

satisfactorily accounted for, relief will be granted, notwithstanding the lapse of time. Mulheron v. Henry S. Koppin Co., 221 Mich. 187, 190 N.W. 674."

 Within the meaning of these and other Michigan cases, the existence of negotiations between the parties is held to satisfactorily explain the delay (Fred Macey Co. v. Macey, supra, 143 Mich. 153, 106 N.W. 722, 5 L.R.A., N.S., 1006), and such negotiations were continually being held in this case between February, 1939, and the filing of the bill. It is an essential element of laches barring relief in equity cases that those against whom relief is sought must have changed their position to their injury. Humiston, Keeling & Co. v. Yore, 181 Mich. 629, 148 N.W. 266; Barron v. Myers, 146 Mich. 510, 109 N.W. 862; Walker v. Schultz, 175 Mich. 280, 141 N.W. 543. No injury to the appellants is shown by the delay. In certain of these cases a much longer time than the six months involved here was held not to constitute delay amounting to laches. In Backus v. Backus, 207 Mich. 690, 695, 175 N.W. 400, four years delay and in Hubert v. Joslin, 285 Mich. 337, 280 N.W. 780, three years was held not to bar relief. As stated by the court in Barron v. Myers, supra [146 Mich. 510, 109 N.W. 863]:

"The law does not require action to rescind before the defrauded person is reasonably certain that he has been defrauded. If he acts with reasonable promptness thereafter, it is sufficient. The law of laches should be used as a shield and not a sword."

In the Kefuss case, supra, the court stated that there was no waiver where the plaintiff was continually lulled into security by promises and excuses. Here Cohn continually turned off Kramer's complaints by excuses and promises of better film service.

A Michigan case which in its essential features resembles the instant controversy is Sweet v. Martin, 233 Mich. 655, 207 N.W. 845. There, in a suit by the vendee for rescission of a contract, for the purchase of certain Michigan resort property on the ground of fraudulent representations, some of which were clearly promissory, it was held that if delay in bringing the suit after the fraud was discovered was induced by the vendor's persuasion and insistence that further trial would demonstrate the truth of their representations, they cannot assert the defense of waiver. We conclude that the appellees are not barred from asserting their claim.

The decree is affirmed.