WALTER N. KELLEY CO. *v.* AUTO BODY CO.

SALES—CONTRACTS—CANCELLATION—QUESTION FOR JURY.
In an action for the contract price of lumber, where plaintiff canceled the contract and defendant claims recoupment for damages because of such cancellation, the trial court was in error in determining as a matter of law that plaintiff had no cause for cancellation.

Error to Ingham; Collingwood (Charles B.), J. Submitted April 7, 1922. (Docket No. 35.)   Decided July 20, 1922.   Reargued February 1, 1923.   Former opinion affirmed July 19, 1923.

Assumpsit by Walter N. Kelley Company against the Auto Body Company for goods sold and delivered. Judgment for defendant.   Plaintiff brings error.   Reversed.

*Cummins & Nichols* (*Codd, Bishop & Kilpatrick* and *Stuart E. Knappen,* of counsel), for appellant.

*Thomas, Shields & Silsbee,* for appellee.

SHARPE, J.   After a more careful reading of this somewhat voluminous record and after hearing the argument of counsel on rehearing, I am unable to agree with the conclusion reached by Mr. Justice BIRD, as reported in 219 Mich. 486, that defendant had so acquiesced in plaintiff's rescission of the several unfilled contracts for the delivery of lumber as to legally terminate them.   Neither upon the trial nor in the briefs filed on the original hearing did plaintiff's counsel make any such claim.   What they did claim was thus stated:

On right to rescind or abandon contract because of other party's default, see note in 30 L. R. A. 33.

On right of seller to rescind or refuse further deliveries upon the buyer's failure to pay for instalments, see note in 14 A. L. R. 1209.

"The court erred in withdrawing from the consideration of the jury the question as to whether or not the contracts had been legally and legitimately canceled."

And further:

"The record so clearly establishes the proposition that this case should have been submitted to the jury, that further argument would seem to be superfluous."

No request to charge that defendant had acquiesced in plaintiff's rescission of the contracts was preferred, nor was this question in any way referred to in the charge as given.

Plaintiff gave notice to defendant of its rescission in its letter of November 1st, which reads as follows:

"We are in receipt of your telegram of this date and according to your instructions we withdraw our proposition of the 25th ult. On account of your not receiving the lumber and paying for it according to contract, we are canceling all the unfilled portion of your different orders."

Two reasons are assigned therefor: *First*, refusal to receive the lumber contracted for, and, *second*, failure to pay for the lumber received.

In order to understand the action taken by plaintiff in this letter, it seems necessary to state the facts which led up to it at greater length than appear in the opinion filed.

The April contracts all provided: "To be shipped as required, prior to October 1, 1919." Each contained a request for a certain shipment "Until further notice." The July contracts all contained the following: "To be delivered after previous orders are filled, as we will advise." The defendant was therefore under no obligation to accept deliveries under the July contracts until after October 1st. It did in fact request shipment of July orders before October 1st, and plaintiff

made shipment though under no legal obligation to do
so.   The total amount which defendant obligated
itself to accept before October 1st was 1,200,000 feet
of elm, 2 cars of soft maple, 10 cars of sap gum and
1 car of oak.   Plaintiff had at that time delivered to
it 1,204,771 feet of elm and 20 cars of other lumber.
While defendant frequently wrote complaining that
plaintiff was making shipments not specially ordered
and plaintiff was complaining over defendant's delay
in ordering, the relations of the parties continued
pleasant and agreeable, each helping the other to
solve the difficulties incident to the changed industrial
conditions then existing, until about September 30th.
Mr. Kelley testified:

"I think it was about September 30, 1919, that we
began to have more or less serious difficulty with the
Auto Body Co.   Up until that time there never had
been differences between us that had not been ad-
justed.   From that time on the next thirty days we
had a good deal of difficulty about the kind of lumber
they were getting on their contract."

It does appear, however, that in a letter written
August 6th defendant complained of a shipment of
6-4 elm under a July order when it had yet due it
elm of that kind under an April order, and plaintiff
explained by saying, "it evidently was an oversight
on the part of the mill."   The several contracts called
for the delivery of Michigan gray elm.   By a sub-
sequent agreement made with Mr. Jackson, defend-
ant's general manager, and Mr. Boyce, its general
purchasing agent, plaintiff had the right to substitute
"Ohio, Indiana and Canadian soft elm" therefor.
Prior to August 29th, defendant had several times re-
quested plaintiff to have the name of the shipping
point of each car noted on the invoice.   On that date
it asked to "have this done without fail hereafter,"
to which plaintiff replied that it would "be more than

glad to give you this information where it is possible."
This request of defendant was apparently renewed at
that time, owing to the fact that it was then receiving cars of elm lumber billed from Evansville, Indiana,
the quality of which was not acceptable.    It had rejected one car and reduced the scale bill of several
others, for which plaintiff allowed it credit.    On
August 25th, defendant had written:

"The 4-4 1st and 2nds elm from Indiana does not
look very good.    Please make no further shipments
whatever of this until we try out what has been received and see whether or not it will stand bending,
for which purpose it was ordered,"

and later complained because another car of similar
lumber had been shipped.    The last shipment to defendant was made by plaintiff on September 17th.    It
was shipped from Evansville on car 200112.    On
October 8th, defendant wrote plaintiff as to this and
other cars:

"This is to confirm the information we gave your
Detroit office over the telephone this morning that the
lumber you have been shipping from Evansville seems
to be all southern soft elm and not what was ordered
by us.
"Before the character of the car No. 200112 was
noticed, it was nearly unloaded, but is kept intact
where you can examine it.    Cars No. 26346 and 38013
are in our yard but will not be accepted and
are here subject to your order.    Car No. 31752 is
not here yet, nor car No. 505870.    As these are undoubtedly southern stock, it would be well for you to
deliver them by wire to some other customer, as we
do not want this southern elm, as your Mr. Kelley
and Mr. Hooten well know, and there is no reason
whatever for this stock being shipped us.    We are
investigating the matter further, as we cannot but
think that every car from Evansville is the same as
these, and you will have to make adjustment on
same.

"Under separate cover by mail we are sending you samples of the stock out of car No. 131108."

Mr. Kelley examined the lumber delivered on car 200112 after it was unloaded in defendant's yard. He testified:

"Mr. Boyce took me down there and showed that car of lumber, down in the yard, and I told him that in my opinion it was a car of southern elm, and that we would take it away, and they could ship it to us."

It thus seems apparent that the differences which led up to the conference of October 24th were due to the quality of the lumber plaintiff was shipping defendant from Evansville. The facts concerning these shipments are so discreditable to plaintiff as to reflect upon the good faith of the claim it now makes. On August 15, 1919, the plaintiff wrote J. E. Rhoades, railroad agent at Evansville:

"We are in receipt of your telegram of even date asking for disposition of LV 30027, lumber from Anderson, Tully Co., Memphis, Tenn. We wrote you under date of the 8th in reference to this proposition, but have had no reply.

"We wired you today as follows:

" 'Wire us amount of freight charges LV thirty naught twenty-seven and we will mail check. This car is to be shipped to Auto Body Company, Lansing, Michigan, on local rate. Show Evansville as originating point.'

"We have several cars of lumber ordered consigned to ourselves at Evansville and we wish to ship this lumber to different customers of ours, and the way we wish to handle it is to pay the charges into Evansville, ship the lumber out on a local rate from Evansville, showing Evansville as the originating point, and if you will kindly wire us on the arrival of each car as to the amount of freight charges we will mail you a check immediately covering the same, giving you shipping instructions on the same.

"Or, we might handle this matter another way. We might make a deposit with you so as to avoid any

car service accruing.    As to our responsibility and method of doing business, we would refer you to Manley & Wertz of your city."

This letter was followed by others of similar import relating to cars billed to plaintiff at Evansville from southern States, and ordered by plaintiff rebilled to defendant as from Evansville.    By so doing, plaintiff sought to satisfy defendant that the lumber so shipped was Indiana lumber and within the terms of the contract as modified.    A more flagrant attempt to commit fraud in the performance of such a contract can hardly be conceived.    As to this transaction, Mr. Kelley testified:

"Our letters of October 25 and 31 (these will be hereafter referred to) were because they would not take the lumber in.    They never had ordered any southern elm from us.    We did not tell the Auto Body Co. that we were shipping southern lumber into Evansville and had an arrangement there with the railroad agent to change our bill of lading and reship to the Auto Body Co.    We did not disclose to them what we were doing at Evansville.    As a matter of fact they did not know it until just a short time ago, when we got notice that if we did not furnish this correspondence they were going to take the deposition of this railroad man down in Evansville."

Nearly all of the correspondence which passed between the parties between September 30th, when Mr. Kelley said their differences began to be manifest, and October 24th was relative to the lumber thus shipped from Evansville.    On October 20th, defendant wrote plaintiff:

"Car 31752, 10-4 elm just arrived.    Was examined this morning and proved to be southern elm.    A telegram was sent you to this effect, that we will not accept same.

"The car is on the track of the N. Y. Central railroad, subject to your instructions.    We learn that same originated south of East St. Louis."

Three days later, Mr. Kelley went to Lansing. A lengthy conference was held between him and Mr. Jackson. Mr. Kelley` testified that the quality of the lumber then in the yard shipped from Evansville was first considered. He and Mr. Boyce went through the yard and examined the lumber. An inspector from the Auto Wheel Company was called in and he said "he could not tell whether the lumber was Indiana grown timber or southern, but that it was high grade stock and he could not understand what difference it made." That he, Kelley, finally told Mr. Boyce "they could ship the lumber to us at Detroit and we would take it away." It was the plain duty of Mr. Kelley at this time to inform Mr. Boyce and Mr. Jackson that this was southern lumber. It was difficult to distinguish between the northern and southern elm until it was used. Ernest McRoberts, general yard man of the defendant, testified:

"The northern gray elm is of such soft texture that it can pass through the different stages of machine work without being damaged by the machine work. It passes along through the routine of machinery without any trouble, but the southern elm, when that strikes into the work and begins to take these first machine operations, for instance in dressing, it is so hard that the timber chips and I have known our mill foreman to complain of the lumber wearing his knives down, getting his machinery out of order and as this lumber progresses through the factory there is more or less of it goes to waste because the machines don't do accurate work on it. * * * That is the reason that it is not advisable to have southern elm in body work. * * * Well, I don't know what the market price is of southern elm, but I would not consider that it would be worth more than fifty per cent. of what the gray elm is to be used in the construction of auto bodies."

William Ryno, who at that time had charge of the mill room and wood work for defendant, testified:

"Southern elm is not practical in making our products. I am somewhat familiar with this lumber that came from the Kelley Lumber Company. We had some southern elm go through our shop. There was more waste in the southern elm, more fall off and rotten and splits and shakes and such. That would be in the lumber itself and in the boards as made from the lumber. I should think the waste on southern lumber would run anywhere from 25 to 40 per cent. more."

Mr. Boyce testified:

"The hard red elm is not desirable for our purposes, because there is too much waste going through the dry kiln and too much waste going through the machines. The red elm is apt to warp and twist in the dry kiln, and the grayish elm is apt to be affected with dry rot on the inside, and you cannot detect it until you saw the lumber up on the saw table. We do not buy southern elm if we can get northern elm. We don't want it at all."

Mr. Kelley further testified that they discussed when defendant would take the balance of the lumber ordered and Mr. Jackson replied "that it was just impossible for them to take in the lumber and if they did take it in they could not pay for it." That he then tried to get a settlement for the lumber shipped to which no objection had been made; that Mr. Jackson said he "would not do anything about the proposition at that time, and for me to go home and write him a letter and tell him just what we would do and what we would not do." As to this conference Mr. Jackson testified:

"I had a conversation with him on October 24th. He had been with Mr. Boyce a good part of the day and with our other men going over these different situations and Mr. Boyce brought Mr. Kelley into my office and I listened to his side of the story somewhat and I knew our side of it, and I also knew that no lumber had been shipped since the 17th of September. I knew the lumber was of inferior quality and a great

deal of it. I was finding out from time to time that more cars had been shipped from the south. It appeared to me that Mr. Kelley was not going to complete his contract. After listening to his story I told him that he should go back to Detroit and write us a firm letter telling us his position and if he would complete our contract, I would see that his payments were made immediately. He asked me to commit myself further and I said I wanted his commitment first as to what he was going to do about this over a million feet of lumber that was due us. I don't recall any other statement I may have made to him."

On the day following Mr. Kelley wrote defendant from Detroit, submitting a proposition for the adjustment of the differences then existing. It is quite lengthy and it will serve no useful purpose to quote it. It contained a definite statement as to when the balance of the lumber was to be shipped with some modifications as to the grade and price fixed in the original orders. It concluded:

"This proposition is based on our being permitted to ship as outlined above, and the terms of payment are the essence of this agreement."

This letter was received by defendant on the 27th. The absence of both Mr. Jackson and Mr. Boyce from Lansing delayed its consideration until November 1st. No time for acceptance was stated in it. On October 31st, plaintiff telegraphed that the proposition would be withdrawn "unless accepted before 12 o'clock November 1st." This was followed by a letter confirming the telegram. Neither the telegram nor the letter was received until November 1st. Mr. Jackson made several ineffectual efforts that day to reach Mr. Kelley on the long distance telephone. At 1:50 p. m., defendant wired plaintiff: "Proceed according to your letter October 31st." Mr. Jackson testified that the date was an error, the intention being to advise plaintiff to proceed according to its letter of

October 25th.    The next morning, November 2d, Mr. Jackson by telephone informed Mr. Kelley that defendant would accept plaintiff's offer of October 25th. He testified Kelley "told me it was too late, that he had canceled all our orders and there was nothing more to do about it." Notwithstanding this answer, Jackson wrote him the following day accepting the proposition of October 25th with some slight modifications. That Kelley did not act on defendant's telegram is apparent because he testified that he did not receive it until November 3d, after his conversation with Jackson over the telephone. Notwithstanding this admission, he wrote the defendant the letter already quoted, dating it back to November 1st.

Plaintiff's right to rescind the contracts can in no way be based on this correspondence. It contained a new offer on the part of the plaintiff, not accepted by defendant. Neither the letter of October 25th, the telegram of October 31st, nor the letter confirming it, contained any statement that plaintiff claimed the right to rescind the original contracts or would do so if its proposition of October 25th was not accepted. A careful reading and consideration of these several writings cannot but lead to this conclusion. The legal effect was but to terminate the negotiations which led up to the offer contained in plaintiff's letter of October 25th, there being no acceptance thereof according to its terms. No question of fact was presented thereby for the consideration of the jury. Plaintiff's notice of rescission in its letter of November 1st is not based on any right to do so arising out of this correspondence. At the time Mr. Kelley advised Mr. Jackson over the telephone that it had canceled its orders at the mills, he had not received defendant's telegram of November 1st. But if the telegram of November 1st be treated as an instruction to plaintiff to "Proceed according to your letter Oc-

tober 31st," I do not think it can be construed as a matter of law into an acquiescence in the rescission of the contract.   This letter reads as follows:

"We wired you today as follows, which we now confirm: 'Proposition our letter 25th unless accepted before 12 o'clock November 1st, is withdrawn.'

"It is absolutely necessary that we know where we stand on your orders at once, which necessitates prompt action, and unless we have positive acceptance according to our proposition before tomorrow noon, November 1st, the same is withdrawn, for you certainly must admit that our disposition is nothing but fair, but we have our own little business to protect. We are receiving cancellation every day from the mills that we have lumber purchased from on account of our inability to move the lumber according to contract, and we are not going to hold orders for any concern and suffer the loss."

Its plain purpose was to advise defendant that plaintiff had withdrawn the offer contained in its letter of October 25th.   That it was not intended as a notice of rescission of the contract is apparent from the fact that it was followed by the letter written several days later, but dated November 1st, in which such notice was given.   That defendant did not intend to acquiesce in plaintiff's rescission of the contract is shown by its letter of November 3d, written before that of November 1st was received by it, and another written on November 4th, ordering another shipment of lumber.   In my opinion, there was no such proof of acquiescence on the part of defendant as to make it an issue in the case.

I do not think it can be said as a matter of law that there was no proof justifying rescission by plaintiff.   The applicable rule as laid down in the uniform sales act is quoted in the opinion of Mr. Justice BIRD. Neither the time of delivery nor the time of payment was made the essence of the contract.   Mr. Kelley

testified that Mr. Jackson said to him on October 24th "that it was just impossible for them to take in the lumber, and if they did take it in they could not pay for it." Mr. Jackson's testimony as to what he then said has been already quoted. In view of this testimony and of the relevant facts and circumstances, I think it was a question for the jury whether there had been such a breach on the part of the defendant in refusing to accept deliveries and to make payments as justified the action taken by plaintiff.

The other errors relied on relate to the admission of evidence and the charge of the court on the measure of defendant's damages. The applicable rule of law is stated in section 67 of the uniform sales act (3 Comp. Laws 1915, § 11898) as follows:

"(11898)    SEC. 67.    Action for failing to deliver goods:

"(1) Where the property in the goods has not passed to the buyer, and the seller wrongfully neglects or refuses to deliver the goods, the buyer may maintain an action against the seller for damages for non-delivery.

"(2) The measure of damages is the loss directly and naturally resulting in the ordinary course of events, from the seller's breach of contract.

"(3) Where there is an available market for the goods in question, the measure of damages, in the absence of special circumstances showing proximate damages of a greater amount, is *the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered, or, if no time was fixed, then at the time of the refusal to deliver.*"

Defendant, over plaintiff's objection, put in evidence a contract it had made on May 17, 1920, with the Brown Land & Lumber Company, of Rhinelander, Wisconsin, for the purchase of lumber to take the place of that which had not been delivered by plaintiff under its contracts. It also was permitted to show

what it had paid for certain lumber under an arrangement made with the Olds Motor Works in January, 1920. The statute clearly defines the damages to which defendant is entitled. The purpose is to compensate for loss. It is the duty of the person sustaining a loss by reason of a breach of contract to minimize such loss to the extent reasonably possible. The time of delivery on the unfilled April orders was fixed as prior to October 1, 1919. On plaintiff's refusal to deliver, it was defendant's duty to at once purchase lumber to take the place of that not then delivered on these orders. The measure of damages for the failure to deliver this lumber would be the difference between the contract price and the market or current price of that which it then should have purchased. There was some variation in the time fixed for delivery under certain of these orders, which need not be specifically pointed out as the rule stated would apply to all of it.

The July orders provided for delivery "after previous orders are filled, as we will advise." Plaintiff, by refusal to perform, could not hasten the time for performance fixed by the contract. It continued in force until such time had arrived. No specific time being fixed for delivery after the previous orders were filled, the law implies a reasonable time therefor. In view of the well-known changing conditions and the upward tendency in the lumber market, it was the duty of defendant as early as possible, and certainly within a reasonable time after being informed that plaintiff would no longer perform, to secure by contract or purchase other lumber to be delivered according to the terms of its contract with plaintiff. The current or market price which it must pay, or contract to pay, for this lumber would be the basis on which its damages must be measured. What it did pay might

be considered by the jury as bearing on the market price at that particular time, but it would not be conclusive thereof.   Under the proofs submitted, it was for the jury to determine what was a reasonable time within which defendant must protect itself by purchasing or contracting for other lumber.   When this time was so fixed by them, it then became their further duty to determine the market price of the lumber at that time and from it arrive at the damages defendant had sustained.   All proof bearing on either of these questions was admissible to aid them in arriving at answers thereto.   I do not think any more definite rule can be laid down and can but hope that under it the jury may be so instructed as to fix a fair and reasonable measure of damages.

I concur in the reversal of the judgment and the granting of a new trial, with costs of this court to plaintiff.

CLARK, MOORE, and STEERE, JJ., concurred with SHARPE, J.

BIRD, J.   Since the opinion was filed in this case an application for rehearing was applied for and granted. Afterwards additional briefs were filed and oral arguments had.   The grounds upon which the rehearing was asked were that the opinion made erroneous statements of fact.   The petition itemized the claimed erroneous statements.   By reason of this claim we have re-examined the record and are satisfied that no material misstatements were made in the opinion.   As illustrating the character of the misstatements complained of the important one will be noticed.   The opinion stated:

"On September 27th defendant advised plaintiff by letter it could not receive another foot of lumber in the yard, and that if it did it could not pay for it."

Defendant's counsel comment upon this and say:

"This is a misstatement, and not founded upon any record evidence. The defendant did write that it could not receive another foot of lumber in its yard, which it had an absolute right to do at that time, but it did not write or communicate to plaintiff that it could not pay for it, and there is no foundation whatsoever in the record for that statement."

The record, at page 74, shows the following testimony by Mr. Kelley, which is nowhere denied:

"In my conversation with Mr. Jackson, I tried to find out when they would take in the balance of the lumber. I explained to him the necessity of our moving this lumber; that the mills were all kicking and threatening cancellation, and that we must move the lumber; that the mills would not hold it any longer for us; *and he stated to me that it was just impossible for them to take in the lumber, and if they did take it in they could not pay for it.*"

The opinion should have stated that this language was used by Mr. Jackson in a conversation with Mr. Kelley on October 24th instead of in a letter of September 27th. Afterward, in the opinion, this correction appears. The fact that the language was used in a conversation on October 24th rather than in a letter on September 27th does not appear to us to be very material.

The other claimed erroneous statements of fact in the statement are quite similar in character to the foregoing and in no wise affect the conclusion which was reached in the case.

At the oral argument on rehearing Mr. Justice SHARPE was inclined to the view that the question whether defendant had so far acquiesced in plaintiff's rescission of the unfilled contracts as to legally terminate them was a question for the jury. For some time prior to October 24, 1919, plaintiff was urging defendant to make payment of the cars delivered and

to receive shipments of those which were overdue. Defendant had repeatedly requested that shipments be held up, and its requests were granted. The correspondence of the parties shows this. Being unable to get results in these respects Mr. Kelley, on October 24th, came to Lansing to see defendant. They talked matters over, but arrived at no conclusion. Kelley was unable to get money, neither was he able to get any assurances that defendant would accept the deliveries which were overdue. Upon being urged to make payment of past-due accounts and to accept shipments which were overdue, Mr. Jackson, vice-president and general manager of defendant, said to Mr. Kelley "that it was just impossible for them to take in the lumber, and if they did take it in they could not pay for it." No conclusion was reached on that day, but finally Mr. Jackson suggested to Mr. Kelley to go home and write him his best terms on which he would go on with the contract. Mr. Kelley went home and on the following day wrote defendant a letter outlining his terms. The letter made some modifications of the original contract, but demanded no increase in price. It demanded payments for deliveries already made and prescribed dates for overdue deliveries. This letter was mailed to defendant on October 25th. A week passed and no reply was received. On October 31st plaintiff wired defendant:

"The proposition of our letter 25th unless accepted before 12 o'clock November 1st is withdrawn."

On November 1st defendant wired plaintiff, as follows:

"Proceed according to your letter October 31st."

In reply to this plaintiff wired defendant on the same day:

"We are in receipt of your telegram of this date and according to your instructions we withdraw our propo-

sition of the 25th ult.    On account of your not re-
ceiving the lumber and paying for it according to
contract we are cancelling all the unfilled portions of
your different orders.
                 (Signed) "WALTER N. KELLEY COMPANY."

On November 3d defendant wrote plaintiff that an
error was made in their telegram, that it should have
read "proceed according to your letter of October
25th."   To this letter plaintiff replied that it was too
late, that the contracts had been cancelled on Novem-
ber 1st.

The uniform sales law is the test by which the rights
of these parties must be measured.    It provides:

"When seller may rescind a contract or sale.   Where
the goods have not been delivered to the buyer, and
the buyer has repudiated the contract to sell or sale,
or has manifested his inability to perform his obliga-
tions thereunder, or has committed a material breach
thereof, the seller may totally rescind the contract or
the sale by giving notice of his election so to do to the
buyer."   3 Comp. Laws 1915, § 11896.

When Mr. Kelley went to Lansing to urge payment
for past deliveries and more promptness in receiving
future deliveries, Mr. Jackson, vice-president and
general manager of defendant, said to him "that it
was just impossible for them to take in the lumber,
and if they did take it in, they could not pay for it."
Did not this language indicate in plain terms defend-
ant's "inability to perform its obligation?"   Was it
not also a breach of the contract?   If it were not,
just what language would be necessary to accomplish
that purpose?   It would have been difficult to ex-
press defendant's "inability" any more tersely.   Mr.
Jackson was defendant's man in authority.   He had
the power to speak for the defendant, and the testi-
mony tends to show that he was telling the truth
about it.   Defendant's yard was full of lumber and
it was hard pressed for funds.   Plaintiff's counsel

call attention to the fact that for cars arriving in September defendant had given its notes for $14,526.56, and had paid thereon only $4,959.86. Two cars were delivered on July 14, 1919, that were not paid for until October 23d; one car delivered July 24th that was not paid for until September 4th; one car delivered July 21st that was not paid for until September 4th; one car delivered July 28th that was not paid for until September 4th; one car delivered August 14th that was not paid for until October 23d. These payments, none of them were in accordance with the terms of the contract.

Defendant being in this condition, unable to pay for past deliveries and to receive overdue deliveries, it gave Mr. Kelley the undoubted right under the statute to immediately cancel the contracts, but he did not do so, he went home at Mr. Jackson's suggestion and wrote defendant the conditions under which he would continue the contract. These conditions were not agreed to, notwithstanding defendant had a week to think them over. When defendant suggested to plaintiff that it submit terms upon which it would go on with the contract it recognized plaintiff's right to rescind. Later, on November 3d, when defendant undertook to, and did, agree to the new terms it again recognized plaintiff's right to rescind.

But whether defendant acquiesced or not when it advised plaintiff that it was impossible to take any more lumber, and if it did it could not pay for it, it indicated, in unmistakable terms, its inability to perform its obligation, and was clearly a breach of the contract, and plaintiff then and there had a right to cancel it. There is no question of fact in it if Mr. Jackson was authorized to speak, and it is nowhere claimed that he was not authorized.

But it is urged that plaintiff itself was in default at the time and, therefore, could not default defendant.

The testimony does not show this. It is true defendant claims that it discovered, in the month of August or September, that southern elm was being shipped to it. Following this, correspondence was had with Kelley concerning it, and on October 13th he visited Lansing for the purpose of investigating it. Mr. Kelley made an inspection of the lumber and said to defendant frankly that he did not attend to the shipments personally and that he was satisfied that certain cars of the elm lumber had come from the south, and that they could ship it back to plaintiff at Detroit. He agreed that five cars might be returned. Afterwards four cars were returned, but, for some reason unknown to plaintiff, the fifth car was not returned, and further, Mr. Kelley said to defendant that if it received any more southern elm it was not obliged to keep it, it could forward it to Detroit. This apparently straightened out the dispute as to the elm lumber and Mr. Kelley then expected defendant would pay what it owed, but it did not do so, and he was obliged to return to Lansing on October 24th. Mr. Justice SHARPE overlooks this trip which Mr. Kelley made to Lansing on October 13th in his review of the matter. In view of this there is nothing to show that plaintiff was in default at the time it cancelled the contract. Even though plaintiff had been theretofore in default, but was not in default at the time the contract was cancelled, it would have a right to cancel the contract, if defendant breached it or indicated its inability to carry it out. *Dow Chemical Co.* v. *Detroit Chemical Works,* 208 Mich. 172 (14 A. L. R. 1200).

There is a further claim that defendant had accepted all the lumber which was due up to November 1st. Counsel say that more than the amount due had been delivered and accepted. This is made out by including in their computation lumber due on the July

order which defendant asked to have delivered to it in advance of the contract time. This in no way affected the April orders. That there was no substantial difference between the parties on November 1st as to the amount due plaintiff and what lumber was yet to be delivered is shown by defendant's letter in replying to plaintiff's letter of October 25th:

"We were only able to get at the matter on Saturday morning, and after checking over the several orders as to the balance due we find some discrepancies between your figures and ours. Mr. Boyce will write you a separate letter regarding his understanding of the balance due, but we feel that the difference will not materially affect the situation."

Again, in its letter, dated November 4th, defendant said:

"As our records of shipments on the different orders varied some from the amounts you gave in your letter of October 25th, the writer has taken time to check them over carefully and finds that practically the only difference is on the 8-4 soft maple order 4874."

Effort was made to show that when Mr. Kelley came to Lansing on October 24th the whole controversy was over the shipment of southern elm. These paragraphs refute that claim and show that they were in accord as to the deliveries made and to be made, and also as to payments made and to be made. The record is very persuasive that this question of delivering southern lumber was a cry raised by defendant long afterward to serve its purpose in this law suit.

The question finally gets around to this: Whether, when Mr. Jackson said to Mr. Kelley "it was just impossible to take in any more lumber in its yard, and if it did it could not pay for it," defendant indicated its "inability to perform its obligation." If it did then there was no question of fact involved and plaintiff had a right to cancel. .

It was claimed by defendant that some of the 12 cars which had been delivered were southern elm. That question has not been discussed because the opinion left that question to be decided in a new trial. Any defense defendant may have to the cars delivered is open to it on the retrial.

The judgment of the trial court is reversed and a new trial granted as to the 12 cars which were delivered.   Plaintiff will recover its costs on rehearing.

WIEST, C. J., and FELLOWS and MCDONALD, JJ., concurred with BIRD, J.